IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHER DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: ) | Chapter 7 |
| ) | |
| RENATO CASALI, ) | Case No. 13 B 30521 |
| ) | |
| Debtor. ) | Judge Jack B. Schmetterer |
| ) | |
| _____ ) | |
| PARKWAY BANK AND TRUST ) | |
| COMPANY, ) | |
| ) | Adversary No. 14-00124 |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| RENATO CASALI, ) | |
| ) | |
| Defendant. ) | |

RENATO CASALI'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendant, Renato Casali ("Casali"), in accordance with this Court's Final Pretrial Order, submits the following proposed Findings of Fact and Conclusions of Law for the trial which is scheduled for November 9, 2015 at 1:30 p.m.

I. PROPOSED FINDINGS OF FACT

1. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157 in that this action arises in and relates to the bankruptcy case. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(c)(I).

2. Venue is proper in this district pursuant to 28 U.S.C. § 1409.

   a. <u>The Parties.</u>

3. Parkway is a secured creditor of Casali as to Casali's personal residence located at 4547 Potawatomie, Chicago, Illinois 60656 (the "Property"), which property is subject of a

1

state court foreclosure case.

4. Casali is a resident of Chicago, Illinois. Casali filed a voluntary petition for relief under Chapter 7 of Title 11 of the United States Bankruptcy Code on July 31, 2013.

    b. Stipulated Facts regarding Parkway's Loan

5. In April 2003, Casali approached Parkway to obtain a personal line of credit from Parkway.

6. At the time Casali approached Parkway to obtain a loan, Casali informed Parkway that he had an existing line of credit with Household Finance.

7. Casali was aware that the proceeds of Parkway's loan paying off Household Finance Corporation's line of credit, obtaining a release of Household's mortgage and Parkway obtaining a first mortgage on the Property would be conditioned upon Household's Line of Credit being paid off.

8. Pursuant to Casali's agreement to use the proceeds from Parkway's loan to payoff Household and grant Parkway a first mortgage on the Property, Parkway entered into a Credit Agreement and Disclosure dated May 5, 2003 with Casali, which was subsequently amended, renewed and replaced by the August 21, 2008 Credit Agreement and Disclosure (the "Note").

9. As security for the Note, Casali and his wife, Anna F. Casali, executed a mortgage ("Mortgage") in favor of Parkway, dated May 5, 2003 and recorded on May 6, 2003 with the Cook County Recorder of Deeds as Document No. 0312649323 and an Assignment of Rents dated May 5, 2003 for the Property ("Assignment of Rents").

10. In addition to executing the Note, Mortgage and Assignment of Rents, on May 5, 2003 Casali executed a Disbursement Request and Authorization Form.

11. On May 7, 2003, Household provided a payoff letter ("Payoff Letter") to Casali, who in turn forwarded it to Parkway wherein Household identified that the amount owed to pay the account in full was $154,731.46 ("Payoff Amount"). The Payoff Letter stated that the total amount due of $154,731.46 was good until June 6, 2003.

12. The Payoff Letter stated that "the payoff quote does not waive our rights to receive any funds, which are due and owing on this account as a result of any subsequent adjustments, which may include but are not limited to recent advances, returned items, and additional fees."

13. The Payoff Letter also stated as follows:

> If the credit line is to be cancelled, please sign below and include this letter with your payment. We will forward the necessary documents to the Trustee/County Recorder's office to release our lien within thirty days after the account is paid in full.
>
> Please cancel my credit line. Unless signed authorization to cancel the credit line is received, the line will remain open and we will not release the lien.

14. Casali and his wife both signed the Payoff Letter instructing Household to close their line of credit.

15. On May 10, 2003, Parkway issued Check No. 67038 to Household Finance Corporation in the amount of $154,731.46.

16. Between 2010 and 2012, Parkway advanced monies for payment of past due and sold real estate taxes on the Property in the amount of $14,710.16.

17. On January 29, 2013, an event of default was declared as a result of Casali's failure to pay when due real estate taxes owing on the Property.

    c. <u>Additional Facts regarding Parkway's Loan</u>

18. The Parkway Closing occurred May 5, 2003; The HFC payoff letter is dated May 7, 2003; The HFC Payoff letter was sent by facsimile by Defendant to Parkway on May 9, 2003; and the check to Household was issued by Parkway on May 10, 2003.

19. The Ordinary standard and reasonable lending practice is to verify amount of payoff before remitting the funds. Parkway did not verify the amount of the Household payoff before remitting its check.

20. Donna Adajar (Parkway employee) had the responsibility to verify that Household's lien was released. She failed to do that. Donna Adajar also failed to keep a log to see if a loan policy was issued to Parkway. Verifying release of a lien was the responsibility of Donna Adajar and that was not done.

21. After a Parkway loan is approved, Parkway used a checklist to prepare for and close the loan. Since the amount of Parkway loan to Casali was over $200,000, it was Parkway's standard operating procedure both today and back at Parkway in 2003 to have a loan policy issued.

22. Had Parkway followed up as to why a title policy was not issued, it would have discovered that Household had not released its mortgage.

23. Parkway handled the closing of the Parkway loan and recording themselves.

24. Parkway should have followed up on getting release of HFC loan and getting copy of title insurance policy that was never issued.

25. 2008 title commitment shows the loan was not released.

26. Parkway assumed that Casali had gotten a 2nd mortgage from Household during the 2008 refinance.

27. Parkway did not use sound lending policy regarding Casali.

REFINANCE OF HOUSEHOLD LOAN

28. In 2003, Casali applied with Parkway Bank and Trust Company ("Parkway") for a line of credit in the amount of $260,000. The primary purpose of the line of was to pay off an existing line of credit he had with Household Finance Corporation, now known as HSBC ("Household"). The line of credit was to be secured by a mortgage on Casali's residence at 4547 Potawatomie, Chicago, IL 60656 (the "Property").

29. Casali's loan application was approved. Parkway ordered a title commitment from Mercury Title Company. The commitment showed Household's mortgage securing its line of credit to Casali in the principal amount of $10,000.00.

THE LOAN CLOSING

30. The closing on the loan occurred on Monday, May 5, 2003. On that date Casali entered into (i) a Credit Agreement and Disclosure with Parkway in the amount of $260,000, (ii) a Mortgage securing the loan, an Assignment of Rents, and (iv) a Disbursement Request and Authorization. Since the loan was a residential refinance secured by a mortgage on the borrower's residence, proceeds from the loan could not be disbursed until after three business days following the closing date. Therefore, the earliest that funds from the closing could be disbursed would have been Friday, May 9, 2003.

31. During the three-day rescission period, Casali obtained a letter from Household on his line of credit with it (the "Payoff Letter"). The Payoff Letter is dated May 7, 2003. Ray faxed the Payoff Letter to Parkway on May 9, 2003. The Payoff Letter states that the amount owed to pay off the line of credit in full is $154,731.46. The Payoff Letter states that it is good until June 6, 2003, but contains the following admonition:

5

32. "**The above quote is subject to a final audit**. The payoff quote does not waive our rights to receive any funds, which are due and owing on this account as a result of **any subsequent adjustments**, which may include but are not limited to recent advances, returned items and additional fees. **Additionally, we will not release any security interest until the account is paid in full**." (emphasis added)

33. In the lower half of the Payoff Letter, there are signature lines for the borrower as to whether the borrower wants to cancel the line of credit. Renato and Anna Casali signed that portion of the letter.

34. On May 10, 2003, without first verifying with Household as to whether the amount stated in the Payoff Letter is correct, Parkway issued a check payable to Household in the amount of $154,731.46. Although, it was Parkway's standard operating procedure to call the lien holder being paid off on the day the check is to be issued to verify the amount of the payoff Parkway failed to do so. According to Household, the amount of Parkway's check was insufficient to pay off the line of credit because it processed a check for $2,858.00 within the three-day rescission period. As a result, Household did not issue a release of its mortgage on the Property.

35. The check processed for $2,858.00 had been tendered at least two months prior and had not been negotiated by the creditor holding the check. That check was the annual payment for a boat slip.

POST-CLOSING INACTIVITY

36. Following the closing, Parkway failed to obtain either a loan policy from Mercury Title Company or a release of mortgage from Household. Verification that an existing

6

mortgage was released was part of Parkway's checklist of loan closing procedures. Keeping a log for post-closing matters, such as receipt of a release or issuance of a loan policy was Parkway's standard operating procedures. Parkway's loan officer, Donna Adajar, who had handled the closing, had the responsibility to verify that Household's mortgage was released. She failed to do so. This was an error by Parkway. Parkway failed to follow sound lending procedure.

2008 LOAN EXTENSION

37. The line of credit had a five-year term. In May, 2008, Parkway extended the line for an additional five years. Prior to granting the extension, Parkway ran a credit report on Casali and ordered a title commitment. The credit report showed that Casali still had a line of credit with Household. The 2008 title commitment showed that Household's mortgage was still of record against the Property. Despite being apprised of these facts, Parkway did nothing to further investigate why Household's mortgage was not released.

DEFAULT UNDER PARKWAY LOAN

38. Casali made all monthly payments due under the loan to Parkway from the inception of the loan until Parkway held them in default in 2013. Casali was held in default for failing to pay real estate taxes on the Property. Parkway claims that it first discovered that Household's mortgage was not released in 2013, when it received minutes of foreclosure when in reality Parkway discovered its error in 2008.

39. Casali believed that since he had a long relationship with HSBC and his account was not closed and the HSBC account paid off that amounts thereafter would be in a new account that was secured mortgage which was now in second position based on the payoff by Parkway. Casali did not know that a check was processed by HSBC during the three day

7

rescission period, as that check had been delivered to the payee a couple of months earlier. Casali believed that the amount in that check was included in the payoff amount by HSBC.

II. CONCLUSIONS OF LAW

40. The party seeking to establish an exception to the discharge bears the burden of proof. Selfreliance Fed. Credit Union vs. Harasymiw (In Re Harysymiw, 895 F.2d 1170, 1172 (7th Cir. 1990). The United States Supreme Court has held that the burden of proof required toestablish an exception to discharge is a preponderance of the evidence. Grogan vs. Garner, 498 U.S. 279, 291 (1992). To provide an "honest but unfortunate debtor "with a fresh start, courts will construe exceptions to discharge strictly against a creditor and liberally in favor of the debtor. *Id.* at 286-87.

41. The Amended Complaint seeks determination of non-dischargeability of debt under section 523(a)(2)(A) of the Bankruptcy Code, which provides that a debtor shall not be discharged from any debt for money "to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's...financial condition. 11 § 523(a)(2)(A)

42. That section describes three separate grounds for holding a debt to be nondischargeable: false pretenses, false representation, and actual fraud. *In re Jairath*, 259 B.R. 308, 314 (Bankr. N.D. Ill. 2001). Each ground for excepting a debt from discharge under § 523(a)(2)(A) must be separately considered. *In re Jacobs*, 448 B.R. 453, 470 (Bankr. N.D. Ill. 2011).

43. To except debts from discharge for false pretenses or false representation, a creditor must show: (1) the debtor made a false representation of fact, a representation, (2) which the

debtor, either (a) knew was false or made with reckless disregard for the truth or (b) that debtor possessed an intent to deceive or defraud (3) upon which the creditor justifiably relied. *In re Davis*, 638 F.3d 549, 553 (7th Cir. 2011); *Ojeda v. Goldberg*, 599 F.3d 712, 716 (7th Cir. 2010). All three elements must be proven to prevail on § 523(a)(2)(A) claim. *In re Ardisson*, 272 B.R. 346, 357 (Bankr. N.D. Ill. 2001). Plaintiff argues that the $2,858.00 check which was presented for payment during the three day period was a false representation or false pretense that the Debtor intended.

44. False pretenses under 11 U.S.C. § 523(a)(2)(A) "include implied misrepresentations of conduct intended to create or foster a false impression." *In re Morgan*, BR 09 B 42248, 2011 WL 3651327, at *4 (Bankr. N.D. Ill. Aug. 18, 2011) (internal citation omitted); *In re Sarama*, 192 B.R. 922, 927 (Bankr. N.D. Ill. 1996). A false pretense does not require overt misrepresentations. *In re Sarama*, 192 B.R. at 928. Rather, "omissions or a failure to disclose on the part of the debtor can constitute misrepresentations where the circumstances are such that the omissions or failure to disclose create a false impression which is known by the debtor." *Id*.

45. False pretenses include:

[A] series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor.... *In re Paneras*, 195 B.R. 395, 406 (Bankr. N.D. Ill. 1996). By contrast, a false representation is an express misrepresentation demonstrated either by a spoken or written statement or through conduct. *In re Morgan*, at *4. A debtor's silence concerning a material fact can also constitute a false

representation. *Id.* (citing *In re Westfall*, 379 B.R 798, 803 (Bankr. C.D. Ill. 2007)). A false representation can be shown through conduct and does not require a spoken or written statement. *In re Jairath*, 259 B.R. at 314.

46. Where the circumstances imply a specific set of facts, a debtor's failure to disclose necessary information to correct a false impression may also constitute a false representation. *In re Malcolm*, 145 B.R. 259, 263 (Bankr. N.D. Ill. 1992). A false representation need not be an overt oral or written lie; it may be established by showing conduct intended deliberately to create and foster a false impression. *In re Jairath*, 259 B.R. at 314.

47. False pretenses and false representation under § 523(a)(2)(A) requires that "the debtor made false representation of fact . . . ." *Ojeda*, 599 F.3d at 716. A false representation under § 523(a)(2)(A) must relate to a present or past fact, and a debtor's false contractual promise will not typically support a § 523(a)(2)(A) claim. *In re Hernandez*, 452 B.R. 709, 723 (Bankr. N.D. Ill. 2011). A promise constitutes a false representation under § 523(a)(2)(A) only if the debtor made the promise without an intention of ever keeping it. *Gene Clarke v. Richard M.. Swanson*, 13 B 14970 (Bankr. N.D. Ill. Jul. 7, 2014) (citing *Perlman v. Zell*, 185 F.3d 850, 852 (7th Cir. 1999); *Chriswell v. Alomari (In re Alomari)*, 486 B.R. 904, 911-12 (Bankr. N.D. Ill. 2013); *In re Hernandez*, 452 B.R. at 723.). The only facts that can be considered by this Court occurred on and prior to May 10, 2003. As a result any future advances or documents cannot be considered in this determination and this court has not considered such evidence.

48. False pretenses, false representation, or actual fraud under § 523(a)(2)(A) requires proof that the debtor acted with intent to deceive. *Pearson v. Howard*, 339 B.R. 913, 919

(Bankr. N.D. Ill. 2006). Intent to deceive requires the debtor's subjective intent to deceive when the debtor made the representations. *In re Monroe*, 304 B.R. at 356.

49. Justifiable reliance by the creditor must be shown for false representations and false pretenses under § 523(a)(2)(A). This requires the creditor to not "blindly rely upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Field v. Mans*, 516 U.S. 59, 71 (1995). The creditor's duty to investigate arises when the falsity of the representation would have been readily apparent. *Ojeda*, 599 F.3d at 717 (citing *Field*, 516 U.S. at 70–71).

50. Parkway has not proven that a misrepresentation or false statement was made by Casali. One of the main facts that Parkway attempted to prove is that the check for $2,858.00 was an intentional attempt by Casali to obtain the loan by Parkway and at the same time cause the HFC loan to not be paid off. Casali's testimony indicates that the check for $2,858.00 was tendered months before the closing of the Parkway loan. There was no way for Casali to have known that the check would be cashed when it was causing the results and this case itself. This could not have been foreseen by Casali and therefore there was no misrepresentation or false statement by Casali.

51. Casali had no intent to deceive Parkway.

52. Parkway itself was the cause of the HFC loan not being paid off. This is because of the lack of sound banking policy by Parkway in this case. Parkway blindly relied upon the HFC payoff. Additionally, Parkway as it evident by the findings of fact took actions which could only be described as unsound banking procedure and/or policy. Parkway did not even take the simple action of calling to confirm that the payoff from HFC was

correct as stated on the payoff statement. In addition, if Parkway had followed up the issue of HFC would have been discovered immediately instead of ten years later. When no release had been tendered, Parkway could have called HFC. Additionally, in 2008 Parkway was aware of the lack of a release and took no action. There is no way possible that Parkway justifiably relied on anything said or represented by Casali. For that to be even remotely possible, Parkway would have to have at least followed its own procedures which it did not.

53. Based on the facts presented and the law Judgment should be entered in favor of Casali.

Respectfully submitted,
RENATO CASALI

/s/ Paul M. Bach
Paul M. Bach, Esq. #6209530
Of Counsel, Sulaiman Law Group, LTD
900 Jorie Blvd, Ste 150
Oak Brook, IL 60523
Phone (630)575-8181
Fax: (630)575-8188