**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **IN RE:** | ) | **Chapter 7** |
| | ) | |
| **RENATO CASALI,** | ) | **Case No. 13 B 30521** |
| | ) | |
| **Debtor.** | ) | **Judge Jack B. Schmetterer** |
| | ) | |
| _____ | ) | |
| **PARKWAY  BANK AND TRUST** | ) | |
| **COMPANY,** | ) | |
| | ) | **Adversary No.  14-00124** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **RENATO CASALI,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>NOTICE OF FILING</u>**

To:     See Certificate of Service

PLEASE TAKE NOTICE that on December 7, 2015, we filed with the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, this Notice of Filing, Certificate of Service, and Plaintiff's Post-Trial Statement, copies of which are hereby served upon you.

Respectfully submitted,

**PARKWAY BANK & TRUST COMPANY**

By:     <u>/s/ Tejal S. Desai</u>
           One of its Attorneys

**Saskia Nora Bryan (ARDC No. 06255682)**
**Tejal S. Desai (ARDC No. 6280834)**
**Latimer LeVay Fyock LLC**
55 West Monroe Street, Suite 1100
Chicago, IL 60603
T: 312/422-8000
F: (312) 422-8001

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | **Chapter 7** |
| | ) | |
| **RENATO CASALI,** | ) | **Case No. 13 B 30521** |
| | ) | |
| Debtor. | ) | **Judge Jack B. Schmetterer** |
| | ) | |
| _____ | ) | |
| **PARKWAY  BANK AND TRUST** | ) | |
| **COMPANY,** | ) | |
| | ) | **Adversary No.  14-00124** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **RENATO CASALI,** | ) | |
| | ) | |
| Defendant. | ) | |

**<u>POST-TRIAL STATEMENT</u>**

Plaintiff, PARKWAY BANK AND TRUST COMPANY ("Parkway") in accordance with this Court's Order of November 13, 2015 submits this Post-Trial Statement.  Parkway filed a complaint seeking a finding that the debt owed to Parkway by Defendant Renato Casali ("Casali") is non-dischargeable pursuant to 11 U.S.C. §523(a)(2)(A).  Parkway claims the debt owed to it by Casali is non-dischargeable because of the false representations he made to Parkway at the time he obtained his loan from Parkway.  Trial in this matter was held on November 9, 10, and 12, 2015.

Parkway has met its burden of proof to show that Casali's debt owed to Parkway is non-dischargeable pursuant to 11 U.S.C. §523(a)(2)(A).  Accordingly, Parkway requests that this Court deny the discharge of Casali's debt owed to Parkway.  The evidence adduced at trial showed that (1) Casali made false representations, namely that he would close his line of credit

with Household Finance Corporation ("Household") and Parkway's mortgage would be first lien

on the property located at 4547 Potawatomie, Chicago, Illinois 60656 (the "Property"), (2)

Casali's pattern of behavior, during and after the closing and disbursement of Parkway's loan

proceeds establishes that Casali made the representations with reckless disregard of the falsity

thereof and with the intent to deceive, and (3) Parkway justifiably relied on Casali's false

representations in closing and funding Parkway's loan.

## I.    FACTS ADDUCED AT TRIAL

The following facts were either stipulated to or established by the relevant evidence

presented at trial:

- In April 2003, Casali approached Parkway to obtain a personal line of credit from Parkway.  (Stipulation of Facts and Documents [hereinafter referred to as "Stipulation], ¶5).

- Casali informed Parkway that he needed a loan from Parkway to pay off his first mortgage and he also wanted to use the proceeds for investment purposes.  (Tr. Vol. I, pg. 23).

- Casali was aware that the proceeds of Parkway's loan would be used to pay off Household's line of credit, obtain a release of Household's mortgage and Parkway obtaining a first mortgage on the Property would be conditioned upon Household's Line of Credit being paid off. (Stipulation, ¶7).

- Based on Casali's agreement to use the proceeds from Parkway's loan to payoff Household and grant Parkway a first mortgage on the Property, Parkway entered into a Credit Agreement and Disclosure dated May 5, 2003 with Casali, which was subsequently amended, renewed and replaced by the August 21, 2008 Credit Agreement and Disclosure (the "Note").  (Stipulation, ¶8; Admitted Parkway's Group Exhibit 1).  Casali and his wife, Anna F. Casali, executed a mortgage in favor of Parkway, dated May 5, 2003 and recorded on May 6, 2003 with the Cook County Recorder of Deeds as Document No. 0312649323 and an Assignment of Rents dated May 5, 2003 for the Property.  (Stipulation, ¶9; Admitted Parkway's Group Exhibit 2).

- On May 5, 2003 Casali executed a Disbursement Request and Authorization Form whereby Casali acknowledged and agreed that the purpose of the Parkway loan was to "Payoff 1st mortgage with Household Finance Company of $80,000.00 and additional funds will be used for investment purposes."  (Admitted Parkway's

Exhibit 3).

- On May 7, 2003, Household provided a payoff letter ("Payoff Letter") to Casali wherein Household identified that the amount owed to pay the account in full was $154,731.46 ("Payoff Amount"). The Payoff Letter stated that the total amount due of $154,731.46 was good until June 6, 2003. (Stipulation, ¶11; Admitted Parkway's Exhibit 4).

- The Payoff Letter stated that "the payoff quote does not waive our rights to receive any funds, which are due and owing on this account as a result of any *subsequent adjustments*, which may include but are not limited to *recent advances*, returned items, and additional fees." *Emphasis added.* (Stipulation, ¶12; Admitted Parkway's Exhibit 4).

- The Payoff Letter also stated as follows:
  If the credit line is to be cancelled, please sign below and include this letter with your payment. We will forward the necessary documents to the Trustee/County Recorder's office to release our lien within thirty days after the account is paid in full.

  Please cancel my credit line.  Unless signed authorization to cancel the credit line is received, the line will remain open and we will not release the lien. (Stipulation, ¶13; Admitted Parkway's Exhibit 4).

- Casali and his wife both signed the Payoff Letter authorizing Household to cancel the credit line. (Stipulation, ¶14; Admitted Parkway's Exhibit 4).

- Casali provided the signed Payoff Letter to Parkway Bank.  (Stipulation, ¶11; Admitted Parkway's Exhibit 4).

- On May 10, 2003, Parkway issued a check made payable to Household in the amount of $154,731.46 (the "Payoff Check") and forwarded to Household the check along with the signed Payoff Letter and a letter to Household requesting that Household issue a release of its mortgage on the Property to Parkway. (Admitted Parkway's Exhibit 5).

- On May 8, 2003, three days after Casali entered into the loan with Parkway and one day after Household issued its Payoff Letter, an additional $2,858.00 was debited from Casali's line of credit with Household. (Admitted Parkway's Exhibit 8).

- Household received and cashed the Payoff Check on May 12, 2003. (Admitted Parkway's Exhibit 8).

- At the time Household received the Payoff Check from Parkway, the amount owed on Casali's line of credit with Household was $156,631.09. (Admitted

Parkway's Exhibit 8).

- The Payoff Check issued by Parkway would have been sufficient to retire the Household debt had the additional $2,858.00 not been debited a day after the Payoff Letter was issued, despite Casali's representation that Household's line would be paid off and closed.  (Admitted Parkway's Exhibit 8).

- On May 29, 2003, after Parkway issued the Payoff Check and the Payoff Check was cashed by Household, Casali withdrew an additional $30,000.00 from Household's line of credit.  (Admitted Parkway's Exhibit 8).

- Casali continued making withdrawals from Household's line of credit on the following dates and for the following amounts:

| **Date** | **Amount** | **Date** | **Amount** |
|---|---|---|---|
| 07/21/03 | $2,156.93 | 02/13/06 | $8,000.00 |
| 07/29/03 | $15,000.00 | 02/16/06 | $10,000.00 |
| 08/11/03 | $20,000.00 | 03/08/06 | $10,000.00 |
| 09/09/03 | $17,000.00 | 04/07/06 | $20,000.00 |
| 10/07/03 | $22,000.00 | 07/03/06 | $20,000.00 |
| 10/21/03 | $30,000.00 | 10/10/06 | $10,000.00 |
| 11/28/03 | $7,000.00 | 12/28/06 | $5,000.00 |
| 03/26/04 | $35,000.00 | 07/12/07 | $1,500.00 |
| 07/26/04 | $23,500.00 | 08/22/07 | $5,000.00 |
| 08/11/04 | $650.00 | 09/12/07 | $5,000.00 |
| 09/11/04 | $25,000.00 | 10/10/07 | $15,000.00 |
| 10/27/04 | $3,400.00 | 04/15/08 | $4,000.00 |
| 11/23/04 | $8,000.00 | 04/15/08 | $11,000.00 |
| 12/03/04 | $125,000.00 | 05/06/08 | $5,000.00 |
| 12/06/04 | $5,000.00 | 08/25/08 | $5,400.00 |
| 12/17/04 | $25,000.00 | 08/26/08 | $3,300.00 |
| 02/10/05 | $15,000.00 | 09/09/08 | $300.00 |
| 02/24/05 | $10,000.00 | 09/10/08 | $20,000.00 |
| 03/04/05 | $8,395.00 | 09/11/08 | $9,000.00 |
| 03/08/05 | $10,000.00 | 10/06/08 | $1,500.00 |
| 03/21/05 | $6,500.00 | 10/07/08 | $100,000.00 |
| 03/24/05 | $10,000.00 | 11/17/09 | $3,000.00 |
| 02/17/05 | $7,000.00 | 12/24/09 | $7,000.00 |
| 06/17/05 | 5,000.00 | 02/09/10 | $3,000.00 |
| 06/23/05 | 20,000.00 | 02/12/10 | $2,000.00 |
| 06/23/05 | $27,000.00 | 03/10/10 | $7,500.00 |
| 10/21/05 | $30,000.00 | 03/19/10 | $10,000.00 |
| 01/04/06 | $11,006.63 | 03/30/10 | $5,000.00 |
| 01/19/06 | $20,000.00 | | |

(Admitted Parkway's Exhibit 8).

- On February 9, 2005, Household issued a letter to Casali informing him that his line of credit with Household reached $0.00 and inquired as to whether or not Casali would like to keep Household's line of credit open and active, or close the account. (Admitted Parkway's Exhibit 9A).

- The February 9, 2005 letter further states as follows:

  If you wish to keep your credit line open and active, you must contact us within the next 15 business days to confirm this decision.  You may contact us using the form below mailed in the postage prepaid envelope provided or fax a copy of the form to 1-800-421-3227.  If you misplace the postage paid envelope, the form should be mailed to PO Box 1547, Chesapeake, VA 23327.

  If we do not hear from you within the next 15 business days confirming your decision to keep this credit limit open, we will assume that it is your intent to pay-off the revolving line of credit.  Therefore, we will close the account and release the lien.  (Admitted Parkway's Exhibit 9A).

- Casali and his wife both executed the form attached to the February 9, 2005 letter instructing Household to keep the line of credit open, active, and not to close the account nor release the lien until instructed.  (Admitted Parkway's Exhibit 9A).

- Between 2010 and 2010, Parkway advanced monies for the payment of past due and sold real estate taxes on the Property in the amount of $14,710.16. (Stipulation, ¶16).

- On January 29, 2013, an event of default was declared by Parkway as a result of Casali's failure to pay when due real estate taxes owing on the Property. (Stipulation, ¶17).

## II.   ARGUMENT

### A.   The Legal Standard

Section 523(a)(2)(A) of the Bankruptcy Code provides that a debtor is not discharged from any debt for money, property, services, or an extension of credit renewal or refinancing of credit obtained by false pretenses, a false representation, or actual fraud other than a statement respecting the debtor's or insider's financial condition.  11 U.S.C. §523(a)(2)(A) (West 2013). In order to except a debt from discharge based on false pretenses or a false representation, a creditor

must establish that: "(1) the debtor made a false representation or omission, (2) which the debtor knew was false or made with reckless disregard for the truth and (b) made with the intent to deceive, and (3) upon which the creditor justifiably relied." *In re Aguilar,* 511 B.R. 507, 512 (Bankr.N.D.Ill.2014), citing *Ojeda v. Goldberg,* 599 F.3d 712, 716-17 (7th Cir. 2010). All three elements must be proven to prevail on a §523(a)(2)(A) claim. *Id.,* citing *Glucona Am., Inc. v. Ardisson (In re Ardisson)*, 272 B.R. 346, 357 (Bankr. N.D. Ill. 2001). Failure to establish any one fact is outcome determinative. *In re Hanson,* 432 B.R. 758, 771 (Bankr.N.D.Ill.2002), citing *In re Jairath,* 259 B.R. 308, 314 (Bankr.N.D.Ill.2001). A creditor must meet this burden by a preponderance of the evidence. *In re McFarland,* 84 F.3d 943, 946 (7th Cir. 1996).

False pretenses "include implied misrepresentations or conduct intended to create or foster a false impression"; a plaintiff is not required to plead overt misrepresentations. *In re Sarama,* 192 B.R. 922, 927-28 (Bankr. N.D. Ill. 1996). Rather, "omission or a failure to disclose on the part of a debtor can constitute misrepresentations where circumstances are such that omissions or failure to disclose create a false impression which is known by debtor. *Id.* Moreover, a broken promise – which would otherwise ordinarily only be actionable in a breach of contract context – can also constitute a false representation if the debtor made the promise without any intention of keeping it. *Perlman v. Zell,* 185 F.3d 850, 852 (7th Cir. 1999).

A false representation is an express misrepresentation demonstrated either by a spoken or written statement or through conduct. *In re Morgan,* 2011 WL 3651327 at *4 (Bankr. N.D. Ill. 1996). A debtor's silence concerning a material fact can also constitute a false representation. *Id.,* citing *In re Westfall,* 379 B.R. 798, 803 (Bankr.C.D.Ill. 2007). A debtor's failure to disclose pertinent information may be a false representation where the circumstances imply a specific set of facts and disclosure is necessary to correct what would otherwise be a false impression. *In re*

*Ryan,* 408 B.R. 143, 157 (Bankr.N.D.Ill.2009)(citing *Trinza & Lepri v. Malcolm [In re Malcolm],* 145 B.R. 259, 263 (Bankr.N.D.Ill.1992)).

A cause of action under Section 523(a)(2)(A) of the Bankruptcy Code also requires a showing that the debtor acted with an intent to deceive. *In re Howard,* 339 B.R. 913, 919 (Bankr. N.D. Ill. 2006). Intent to deceive is measured by the debtor's subjective intention at the time the representation was made. *In re Monroe,* 304 B.R. 349, 356 (Bankr. N.D.Ill. 2004). Because proof of fraudulent intent may be unavailable, the scienter requirement may be inferred from surrounding circumstances. *In re Kucera,* 373 B.R. 878, 884 (Bankr.C.D.Ill.2007). Courts can consider subsequent conduct as long as that conduct provides an indication of the debtor's state of mind at the time of the actionable representations. *Hanson,* 432 B.R. at 327, citing *Williamson v. Busconi,* 87 F.3d 602, 603 (1st Cir. 1996)(explaining that "subsequent conduct may reflect back to the promisor's state of mind and thus may be considered in ascertaining whether there was fraudulent intent at the time the promise was made"). Determining whether a debtor had the requisite intent under §523(a)(2)(A) is, therefore, a factual, subjective inquiry decided by examining all of the relevant circumstances, including those that took place after the debt was incurred. *In re Howard,* 339 B.R. 913, 919 (Bankr.N.D.Ill.2006).

In addition to establishing a false representation or omission, which the debtor knew was false or made with reckless disregard for the truth and made with the intent to deceive, a creditor must also show that the creditor justifiably relied upon the false representation or omission. In *Fields v. Mans,* 516 U.S. 59, 74-75 (1995), the United States Supreme Court held that §523(a)(2)(A) requires a showing of justifiable, but not reasonable, reliance. In holding that justifiable reliance is the standard to be employed under §523(a)(2)(A), the Court cited to the Restatement of Torts (Second), which states that "a person is required to use his senses, and

cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he utilized his opportunity to make a cursory examination or investigation." *Id.* Citing to the 1978 edition of Prosser's Law of Torts, the Court stated that justifiable reliance is the standard applicable to a victim's conduct in cases of alleged misrepresentation and that "it is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own." *Id.*

As will be set forth below, the evidence at trial establishes that Casali made false representations to Parkway with reckless disregard for the truth and intent to deceive and which Parkway justifiably relied upon in making its loan to Casali. Parkway has met its burden of proof under §523(a)(2)(A) to show that the debt owed to Parkway by Casali is non-dischargeable.

### B.  False Representation of Fact

The first element under §523(a)(2)(A) requires that a creditor prove that the debtor made a false representation of fact. *Aguilar,* 511 B.R. at 512. An examination of the evidence at trial reveals that Casali made two misrepresentations or false representations of fact: (1) Casali would close his line of credit with Household and (2) Parkway's mortgage would be in first position.

### 1)  *False Representation #1: Closing of Household's Line of Credit*

Casali's representation that he would close his line of credit with Household was an inherent part of his loan application with Parkway. At the trial in this matter, Ms. Laura D'Amato ("Ms. D'Amato") of Parkway Bank testified that Casali needed a loan from Parkway to pay off his first mortgage with Household and use the loan proceeds for investment purposes. (Tr., Vol. I, pgs. 23, 42-43). Casali also acknowledged in writing that the purpose of the loan

from Parkway was to payoff Household and use the remaining proceeds for investment purposes. (Admitted Parkway's Trial Exhibit 3). Casali's execution of the Note, Mortgage, and Assignment of Rents further establishes his representation to payoff and close his line of credit with Household.  (Admitted Parkway's Group Exhibits 1 & 2). Ms. D'Amato also testified that in order to payoff Household's line of credit, Casali provided the Payoff Letter he obtained from Household to Parkway stating the payoff amount necessary to payoff Household in full.  (Tr. Vol. I, pgs. 42-43; see also Admitted Parkway's Exhibit 4). Casali's representation that he would close his line of credit with Household was further supported by Casali and his wife, Anna Casali's, signature at the bottom of the Payoff Letter instructing Household to close their line of credit.  (Admitted Parkway's Exhibit 4).

In response to Household's Payoff Letter received from Casali, Ms. D'Amato testified that Parkway generated a payoff check to Household to payoff Casali's line of credit with Household.  (Tr. Vol. I, pgs. 51-52; see also Admitted Parkway's Exhibit 5).  Parkway then issued the Payoff Check to Household along with the signed Payoff Letter by Casali and his wife and disbursed the remaining loan proceeds to Casali.  Ms. Quandrea Fester ("Ms. Fester") of Household testified that Household received the payoff amount and applied it to Casali's account on May 12, 2003. (Tr. Vol. I, pgs. 136-137; Admitted Parkway's Exhibit 8).  Ms. Fester also testified that on May 8, 2003, May 29, 2003, July 29, 2003, additional draws were made on Casali's line of credit with Household.  (Tr. Vol. I, pgs. 136-139; Admitted Parkway's Exhibit 8). It is clear from the evidence at trial that Casali continued to make numerous draws on his line of credit with Household after the closing and disbursement of Parkway's loan. (Admitted Parkway's Exhibit 8).

Based on the testimony of Ms. D'Amato, Ms. Fester, and the evidence at trial, it is uncontested that Casali did not close his line of credit with Household as he represented he would do so at the time he entered into his loan with Parkway. As such, Casali's representation that he would close his line of credit with Household at the time he entered into his loan with Parkway is a false representation, which meets the first prong of the analysis under §523(a)(2)(A).

### 2) False Representation #2: Parkway's Mortgage would be in First Position

Casali also made a false representation that Parkway's Mortgage would be in first position on the Property. By signing the loan documents, particularly the Mortgage, Casali expressly acknowledged and represented that Parkway's mortgage would be in first position. Specifically, the paragraph titled "Taxes and Liens", subsection "Payment" on pg. 4 of the Mortgage states the following:

> "Grantor shall maintain the Property free of any liens having priority over or equal to the interest of Lender under this Mortgage except for those liens specifically agreed to in writing by the Lender and except for the lien of taxes and assessments not due as further specified in the Right to Contest paragraph. (Admitted Parkway's Group Exhibit 2).

The above representation in the Mortgage, which Casali signed, was false. Ms. D'Amato testified that Parkway never received a release of Household's mortgage on the Property (Tr. Vol. I, pgs. 71, 77, 85). In addition, Household's letter of February 9, 2005 that Casali executed and returned to Household instructing Household to keep his line of credit open and not release its lien on the Property proves that Household never released its lien, which in turn establishes that Parkway's Mortgage was not in first position, thereby rendering the falsity of Casali's representation. Furthermore, Casali testified that his line of credit with Household remained open even after closing on his loan with Parkway. (Tr. Vol. III, pgs. 151-152).

Similarly, the falsity of Casali's representation that Parkway's Mortgage would be in first position is established by the pending state court foreclosure proceedings.  This Court can take judicial notice of the state court foreclosure proceedings, which is currently pending in the Circuit Court of Cook County, Chancery Division, Mortgage Foreclosure Section, Case No. 13 CH 08411, titled *Parkway Bank and Trust Company v. Renato Casali, et al.*, wherein Household filed a counterclaim to Parkway's foreclosure complaint asserting priority and a first lien position over Parkway's Mortgage. The loan documents, the testimony of Ms. D'Amato and Casali, and Casali's execution and return of the February 9, 2005 letter proves the falsity of Casali's representation that Parkway's Mortgage would be in first position.

### 3) *Casali Had an Obligation to Disclose that the Payoff Letter Amount was Inaccurate.*

As explained above, Casali misrepresented that he would close the Household line of credit and that Parkway would have a first lien position. Casali may argue that these were not false statements because they were true at the time he made them; in other words, that it was only after he signed the loan documents that he took actions that were inconsistent with his representations therein. However, fraud is also established through implied misrepresentations and an omission or failure to disclose material facts which create a false impression. Casali failed to disclose to Parkway that the Payoff Letter was inaccurate. Casali was in a unique position to know what the balance on his Household line of credit was. He received statements from Household. (Tr. Vol. III, pg. 121).  He knew or should have known what checks he had written on the account, and therefore what amounts outstanding there were. To the extent there was an outstanding check on the Household line of credit, Casali had an affirmative obligation to disclose that to Parkway. His failure to do so constituted an omission designed to create a false impression on the part of Parkway.

**C. Knowledge that the Representations were False or Made with Reckless Disregard for the Truth and Made with the Intent to Deceive.**

The second prong of the analysis under §523(a)(2)(A) of the Bankruptcy Code requires that Parkway prove that Casali knew the representations were false and or made with reckless disregard for the truth and made the representations with intent to deceive. *Aguilar,* at 512-513. Casali's pattern of behavior during and after the closing and disbursement of Parkway's loan proceeds establishes that Casali knew the representations he made to Parkway were false or made with the reckless disregard for the truth and intent to deceive.

Specifically, Ms. Fester testified that on May 8, 2003, a draw was made on Casali's Household account in the amount of $2,858.00. While Casali contends that this draw was the result of a check written to vendor months prior which was only tendered for payment on May 8, 2003, Casali testified that he does not recall this specific transaction. (Tr. Vol. III, pg. 134). Ms. Fester further testified that on May 29, 2003, nineteen days after Parkway disbursed its loan, Casali withdrew at a branch office of Household an additional $30,000.00 from his line of credit. (Tr. Vol. I, pgs. 137-138). Household's loan history (Admitted Parkway's Exhibit 8) shows that Casali made a numerous draws on his Household line of credit after Parkway disbursed its loan on May 10, 2003. The draw of May 8, 2003 and subsequent draw made on May 29, 2003 establishes that Casali did not close his line of credit as he represented he would do so. Even if this Court gives credit to Casali's argument that the $2,858.00 check was issued months prior, but only tendered for payment on May 8, 2003, Casali's conduct of repeatedly drawing on his Household's line of credit is inconsistent with his representations he made at the time he entered into his loan with Parkway.

Ms. Fester also testified that Household issued monthly bank statements to Casali showing payments made on the account, draws made, the balance owed, and the next payment

due on his line of credit.   (Tr. Vol. I, pg. 154).   Casali would have received monthly bank statements from Household showing the draw he made on May 8, 2003, the payment received by Household from Parkway in the amount of $154,731.46 to pay down his line of credit, as well as the draws he made on May 29, 2003 and July 29, 2003.   The fact that he continued to draw on the line of credit even after disbursement of Parkway's loan and had knowledge of these draws by virtue of the statements he received from Household is further evidence of that Casali's representations were made with reckless disregard for the truth and his intent to deceive.

Moreover, Casali's own testimony establishes that he made the representations with reckless disregard for the truth and he intended to deceive.   Casali testified that a few weeks after he closed on his loan with Parkway, he received a mailing from Household informing him that his line of credit was still open.   (Tr. Vol. III, pg. 134).   After receiving the mailing from Household stating that his line of credit remained open, Casali contacted Household's customer service center to confirm if his line remain opened and received confirmation that in fact his line remained open.   (Tr. Vol. III, pg. 142).   According to Casali, he did not give Household instructions to close his line of credit because was never told that he was supposed to call them himself and do that. (Tr. Vol. III, pg. 160).   In fact, the evidence has shown that Casali did the exact opposite.

On February 4, 2005, Casali's account balance with Household reached zero.   (Tr. Vol. I, pg. 142).   On February 9, 2005, Household issued a form letter to Casali asking Casali if he wanted to keep the credit line open or if he wanted it to be closed. (Tr. Vol. I, pg. 143; Admitted Parkway's Exhibit 9A). Despite being given the opportunity to close his line of credit with Household, Casali and his wife executed and returned the February 9, 2005 letter to Household specifically instructing Household to keep the line of credit open and not release the lien on the

Property.  (Admitted Parkway's Exhibit 9A; Tr. Vol. I, pg. 147-148).  In 2003 after closing of

Parkway's loan and in February 2005, Casali had specific knowledge that his line of credit with

Household remained open and that Household had a lien on the Property, yet failed to take any

steps to close the line of credit.

In addition, Casali's intent to deceive and induce Parkway to act is conceded by the fact

that Casali executed the loan documents in favor of Parkway and his execution of the Payoff

Letter instructing Household to close his line of credit.  If he did not intend to deceive and induce

Parkway to act on his representations, he would not have executed the loan documents, let alone

submit to Parkway and sign the bottom of the Payoff Letter instructing that his line be closed.

Casali's pattern of behavior of taking repeated draws on his Household line of credit after

the closing and disbursement of Parkway's loan coupled with his knowledge that his Household

line of credit remained open shortly after the disbursement of Parkway's loan, his failure to take

any action to close the line, and his express authorization to Household in February 2009 to keep

his line of credit open and not release the lien on the Property proves that Casali knew that his

line was open and not closed and that Parkway's mortgage would not be in first position.

Casali's actions establish that the representations he made to Parkway at the time he entered into

the loan with Parkway were made with reckless disregard for the truth and made with the intent

to deceive.  As a result, Parkway has met is burden of proof to satisfy the second prong of the

analysis under §523(a)(2)(A).

### D.  Justifiable Reliance

The final prong examines whether the creditor justifiably relied upon the

misrepresentation.  Justifiable reliance is a less demanding standard than reasonable reliance; it

requires only that a creditor did not "blindly [rely] upon a misrepresentation the falsity of which

would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Ojeda v. Goldberg,* 599 F.3d 712, 717 (7th Cir. 2010), citing *Fields,* at 71. Under the justifiable reliance standard, a creditor has no duty to investigate unless the falsity of the representation would have been readily available. *Id.,* citing *Fields,* at 71. But justifiable reliance is not an objective one. *Id.* Rather, it is determined by looking at the circumstances of a particular case and the characteristics of a particular plaintiff. *Id.* In short, "justifiable reliance" is not intended to shield debtors from the consequences of their fraudulent conduct, but to ensure that creditors cannot proceed in willful ignorance when they have reasonable notice that fraud may be afoot. *See, e.g. In re Campbell,* 372 B.R. 886, 892 (Bankr. C.D. Ill. 2007) (a "plaintiff may not bury his head in the sand and willfully ignore obvious falsehoods.") An examination of the evidence adduced at trial, particularly, the testimony and expert report of Parkway's expert witness, Ms. Sue Woods ("Ms. Woods"), reveals that Parkway was justified in relying upon Casali's representations.

### 1) Parkway Justifiably Relied on Casali's Representations in Closing on its Loan with Casali.

Ms. Woods testified that Parkway acted reasonably in closing its loan with Casali. (Tr. Vol. II, pg. 61). Ms. Woods opined that Parkway acted reasonably in closing its loan with Casali because (a) it had obtained a title insurance commitment, (b) required Casali to execute a Disbursement Request and Authorization Form, Mortgage, and Assignment of Rents, (c) recorded Parkway's Mortgage, (d) recorded a prior release of lien from a 1999 trust deed that appeared on title, (e) obtained a recently dated payoff letter covering the disbursement date of Parkway's loan, and (f) ensured that Casali had executed the direction at the bottom of the Payoff Letter directing Household to close his line of credit. (Admitted Parkway's Exhibit 12).

Parkway's justifiable reliance is further established by Parkway's reliance on the Payoff

Letter obtained by Casali from Household.  Because the Payoff Letter states the total amount due, gives a specific amount, states that the payoff is good until June 6, 2003, gives a per diem amount, requests that the account number be referenced, and a check in the amount of $154,731.46 be issued to Household, Ms. Woods opined that Parkway was justified in relying on the Payoff Letter despite the language in the letter stating that the payoff quote does not waive Household's rights to receive any funds which are due and owing. (Tr. Vol. II, pg. 91). By obtaining the Payoff Letter, obtaining Casali's signature at the bottom of the Payoff Letter, promptly cutting a check to Household for the payoff amount of $154,731.46, and tendering the Payoff Check to Household along with the signed Payoff Letter, Parkway acted reasonably in closing its loan with Casali.  (Admitted Parkway's Exhibit 12).

Similarly, in 2003, it would not be typical for a lender with an outstanding unpaid mortgage to give a release in advance of the closing of the mortgage intended to refinance it. (Tr. Vol. II, pg. 96; see also Admitted Parkway's Exhibit 12).  Rather, it was typical in refinance transactions, such as the case with Parkway's loan, to obtain a current payoff letter and for the closer of the refinancing lender to send a payoff check in accordance with the letter.  (Admitted Parkway's Exhibit 12).  Parkway did exactly this---it received a current payoff from Household and sent the Payoff Check along with the signed Payoff Letter to Household in accordance with the terms of the Payoff Letter.

The evidence at trial shows that Parkway changed its position, i.e. disbursed its loan proceeds, in reliance upon the (a) language of the Payoff Letter, including the good through date and the instruction to close the line of credit, (b) title commitment it obtained, (c) loan documents, and (d) Payoff Check it issued in the exact amount provided for in the Payoff Letter which was good through the date by which the Payoff Check was received.  Parkway's reliance

was justified especially in light of the fact that the documents relied upon by Parkway were normal and standard to rely on in the lending industry.

Parkway had no reason to believe that the Payoff Letter amount would change due to Casali's actions - either by him withdrawing an additional amount after tendering the Payoff Letter to Parkway, or because Casali failed to disclose that there was an outstanding check due on the account that rendered the payoff amount inaccurate. In either case, Parkway had no reason to look beyond the Payoff Letter. It was only due to Casali's actions that the amount in Payoff Letter was insufficient, and only Casali was in the position to know this material fact, which he failed to disclose to Parkway.

Parkway's conduct in closing and funding its loan to Casali, including but not limited to obtaining a title commitment, having Casali execute the loan documents, obtain a payoff letter, issue a Payoff Check in response to the Payoff Letter received, obtaining Casali's signature on the Payoff Letter instructing Household to close Casali's line of credit and submitting the Payoff Check and signed Payoff Letter to Household provides support that Parkway took actions based on his representations and in doing so, justifiably relied on his representations.

**2)** ***Parkway Justifiably Relied on Casali's Representations Even Though Parkway did not Obtain Confirmation from Household as to whether Household's Line Had Been Closed and Follow-Up on a Release of Mortgage.***

While Parkway does not contest the fact that after it issued the Payoff Check, it did not follow-up with Household to confirm that Casali's line of credit had been closed, it was not unreasonable for Parkway to assume that Household would follow the express direction by its borrower to close out the account. (Admitted Parkway Exhibit 12). Ms. Woods testified that it would be reasonable for Parkway to expect that Household would close Casali's line of credit even if full payoff had not been received since the language of the Payoff Letter did not contain

any express language stating that the line would not be closed absent a full payoff.  (Tr. Vol. II, pgs. 84, 93, 94; see also Admitted Parkway's Exhibit 12).  It was also reasonable for Parkway to assume that Casali would act in accordance with the direction that he had given to Household to close the account. (Admitted Parkway's Exhibit 12).

Additionally, it was reasonable for Parkway not to be alerted to an on-going problem because it did not get a release of mortgage from Household.  (Tr. Vol. II, pgs. 80; 103; see also Admitted Parkway's Exhibit 12).  Parkway's conduct in promptly sending the Payoff Check to Household, Household negotiating the Payoff Check on May 12, 2003, Household never informing Parkway that the Payoff Check was insufficient to payoff Casali's line of credit, let alone that Household would not be releasing its lien proves that Parkway acted reasonably in closing its loan with Casali. (Admitted Parkway's Exhibit 12).

While Casali's expert, Ms. Mary Jahnke ("Ms. Jahnke"), testified that Parkway should have followed up to obtain a release, her testimony is premised on the position that a lender bears the *entire* burden of protecting itself, regardless of the borrower's actions or representations. This is not a justifiable reliance standard. Ms Jahnke admitted that she believes a lender must "never" rely on or trust any statement from a borrower. (Tr. Vol. III, pgs. 60-61).  Ms. Jahnke is a closing agent, so her personal code of performing her job is both understandable and commendable. But it does not reflect either the appropriate legal standard, or the typical industry standard for closing lenders performing refinances. To credit Ms. Jahnke's opinion is to hold that a lender can never establish fraud, because they can never justifiably rely on anything. This is not true, and it is therefore not applicable or relevant in this case.

Parkway's justifiable reliance is further supported by Ms. Woods testimony that at the time Parkway made its loan to Casali, it was not uncommon for a mortgage that had been

actually paid off not to be released of record due to the volume of refinances and other transactions occurring during this time period. (Tr. Vol. II, pgs. 88-89, 99). This is evidenced by the fact that in this case, there had been a 1999 trust deed that had been paid off at the time Household entered into its loan with Casali and took its mortgage on the Property, but the 1999 trust deed was never released until Parkway obtained a release and recorded the release at the time it closed on its loan with Casali. (Tr. Vol. II, pgs. 101-102).

The testimony of Sue Woods combined with the evidence presented and admitted at trial shows that the falsity of Casali's misrepresentations were not readily available to Parkway. As such, Parkway had no duty to investigate and Parkway's reliance on Casali's misrepresentations was justified.

### 3) Parkway Justifiably Relied on Casali's Representations in Closing and Funding its Loan even though Parkway did not Close at a Title Company or Obtain a Title Insurance Policy Insuring its First Lien Position.

The evidence has shown that Parkway did not close its loan with Casali at a title company and failed to obtain a title insurance policy. Despite these facts, Parkway's justifiable reliance is not obviated by the fact that there could have been, in hindsight, a method by which a plaintiff could have avoided being defrauded.

As set forth above, it would not be typical for a lender to have had a release in hand at the time of closing and disbursing its loan. (Admitted Parkway's Exhibit 12). It would be typical to have a current payoff letter and make payment in accordance with the payoff letter, which is exactly what Parkway did in this case. In addition, during the time period in which Parkway made the loan to Casali, it was not uncommon for title companies not to receive releases of prior mortgages they had paid off at closings after having sent a payoff check with a request for a release. (Tr. Vol. II, pg. 97; see also Admitted Parkway's Exhibit 12). Likewise, title companies

would issue title policies without ever having received a release based on the fact that they knew they had paid off a prior lender. (Tr. Vol. II, pg. 101). Ms Jahnke also testified that a title company could issue a final title policy before the release deed is recorded. (Tr. Vol. III, pg. 86, 87).

Even if Parkway had closed at a title company, Ms. Woods testified that sometimes a prior lender would not issue a release even though they were fully paid off and even though there was a statutory penalty for failure to issue a release in a timely manner. (Tr. Vol. II, pg. 112). Ms. Woods further opined that the title company sometimes would follow-up with the lender to ask for a release if they had not received it, but that did not mean that the release was forthcoming from the lender who was fully paid off. (Tr. Vol. II, pg. 112). In addition to following up on releases, Ms. Jahnke admitted that lenders often had to "chase" title companies to obtain a final title policies, acknowledging that this was common in the industry. (Tr. Vol. III, pg. 88).

In addition, closing at a title company could not have prevented Casali from making future draws on Household's line of credit, let alone from keeping Household's line of credit open (Tr. Vol. II, pg. 98), which discredits Casali's claim that closing at a title company would have avoided these issues for Parkway. Failing to obtain a title policy or close at a title company does not change the fact that Parkway no longer had control of the funds it paid out on this loan once the Payoff Check was negotiated and the remaining funds were made available to Casali. (Tr. Vol. II, pg. 95). Parkway changed its position at the time it disbursed the loan proceeds by virtue of the issuance and the negotiation of the Payoff Check, which it would not have done but for Casali's representations. While Parkway may not have taken every precaution to protect itself, it certainly did not turn a blind eye to the misrepresentations made by Casali.

Accordingly, Parkway's reliance on Casali's representations was justified.

## III.    CONCLUSION

The evidence at trial has shown that but for Casali's misrepresentations of closing the line of credit with Household Finance and Parkway's mortgage being in 1st position, Parkway would not be in the position it is in today.  Based on the all evidence presented in this case, Parkway has met its burden of proof under Section 523(a)(2)(A) of the United States Bankruptcy Code. Accordingly, Parkway asks that the debt owed by Renato Casali to Parkway Bank be deemed non-dischargeable pursuant to 11 U.S.C. §523(a)(2)(A)

Respectfully submitted,

**PARKWAY BANK & TRUST COMPANY**

By:    /s/ Tejal S. Desai
          One of its Attorneys

**Saskia Nora Bryan (ARDC No. 06255682)**
**Tejal S. Desai (ARDC No. 6280834)**
**Latimer LeVay Fyock LLC**
55 West Monroe Street, Suite 1100
Chicago, IL 60603
T: 312/422-8000
F: (312) 422-8001

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certify that, on December 7, 2015, the foregoing Notice of Filing and Plaintiff Parkway Bank and Trust Company's Post-Trial Statement was served via the U.S. Bankruptcy Court for the Northern District of Illinois CM/ECF electronic document filing system, upon the following attorneys of record:

***<u>Counsel Defendant Renato Casali</u>***

Paul Bach - paul.bach@sulaimanlaw.com

Joel Chupack- jchupack@h-and-k.com



/s/ Tejal S. Desai

**Saskia Nora Bryan (ARDC No. 06255682)**
**Tejal S. Desai (ARDC No. 6280834)**
**Latimer LeVay Fyock LLC**
55 West Monroe Street, Suite 1100
Chicago, IL 60603
T: 312/422-8000
F: 312/422-8001