**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | Chapter 7 |
| RENATO CASALI, | ) | Case No. 13-30521 |
| Debtor. | ) | |
| | ) | Honorable Judge Jack B. Schmetterer |
| PARKWAY BANK & TRUST COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | Adversary Number 14 A 124 |
| RENATO CASALI, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT RENATO CASALI'S POST TRIAL BRIEF AND STATEMENT**

Defendant, Renato Casali ("Defendant") submits this Post-Trial Brief and Statement in compliance with the Court's Order entered on November 13, 2015. Parkway Bank and Trust ("Parkway") on February 15, 2014, filed a complaint seeking a finding that the debt owed to Parkway by Casali was non-dischargeable pursuant to 11 U.S.C. §523(a)(2)(A). Parkway claimed the debt owed to it by Casali was non-dischargeable because of false representations he allegedly made to Parkway at the time he obtained his loan from Parkway. After the initial Complaint was dismissed by this Court on August 29, 2014, Parkway filed an Amended Complaint on November 25, 2014. After a Motion to Dismiss the Amended Complaint was denied on March 12, 2015, an Answer to the Amended Complaint was filed on March 26, 2015. The trial was held on November 9, 10, and 12, 2015.

Parkway's burden of proof to show that Casali's debt owed to Parkway is nondischargeable has not been met pursuant to 11 U.S.C. §523(a)(2)(A). Parkway has not been

1

able to demonstrate the existence of even one of the three required elements.  As a result, Casali

asks that this Court enter Judgment in his favor and against Parkway.

## I.    FACTS

A. **Stipulated Facts** (By numbered paragraph in Amended Stipulation which was
admitted into evidence at the beginning of the trial).

1.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

§§ 1334 and 157 in that this action arises in and relates to the bankruptcy case.  This adversary

proceeding is a core proceeding pursuant to 28 U.S.C. § 157(c)(I).

2.    Venue is proper in this district pursuant to 28 U.S.C. § 1409.

3.    Parkway is a secured creditor of Casali as to Casali's personal residence located at

4547 Potawatomie, Chicago, Illinois 60656 (the "Property"), which property is subject of a state

court foreclosure case.

4.    Casali is a resident of Chicago, Illinois.  Casali filed a voluntary petition for relief

under Chapter 7 of Title 11 of the United States Bankruptcy Code on July 31, 2013.

5.    In April 2003, Casali approached Parkway to obtain a personal line of credit from

Parkway.

6.    At the time Casali approached Parkway to obtain a loan, Casali informed Parkway

that he had an existing line of credit with Household Finance.

7.    Casali was aware that the proceeds of Parkway's loan paying off Household

Finance Corporation's line of credit, obtaining a release of Household's mortgage and Parkway

obtaining a first mortgage on the Property would be conditioned upon Household's Line of

Credit being paid off.

8.    Pursuant to Casali's agreement to use the proceeds from Parkway's loan to payoff

Household and grant Parkway a first mortgage on the Property, Parkway entered into a Credit

Agreement and Disclosure dated May 5, 2003 with Casali, which was subsequently amended, renewed and replaced by the August 21, 2008 Credit Agreement and Disclosure (the "Note").

9.      As security for the Note, Casali and his wife, Anna F. Casali, executed a mortgage ("Mortgage") in favor of Parkway, dated May 5, 2003 and recorded on May 6, 2003 with the Cook County Recorder of Deeds as Document No. 0312649323 and an Assignment of Rents dated May 5, 2003 for the Property ("Assignment of Rents").

10.     In addition to executing the Note, Mortgage and Assignment of Rents, on May 5, 2003 Casali executed a Disbursement Request and Authorization Form.

11.     On May 7, 2003, Household provided a payoff letter ("Payoff Letter") to Casali, who in turn forwarded it to Parkway wherein Household identified that the amount owed to pay the account in full was $154,731.46 ("Payoff Amount").  The Payoff Letter stated that the total amount due of $154,731.46 was good until June 6, 2003.

12.     The Payoff Letter stated that "the payoff quote does not waive our rights to receive any funds, which are due and owing on this account as a result of any subsequent adjustments, which may include but are not limited to recent advances, returned items, and additional fees."

13.     The Payoff Letter also stated as follows:

> If the credit line is to be cancelled, please sign below and include this letter with your payment. We will forward the necessary documents to the Trustee/County Recorder's office to release our lien within thirty days after the account is paid in full.

> Please cancel my credit line.  Unless signed authorization to cancel the credit line is received, the line will remain open and we will not release the lien.

14.     Casali and his wife both signed the Payoff Letter instructing Household to close their line of credit.

3

15.     On May 10, 2003, Parkway issued Check No. 67038 to Household Finance Corporation in the amount of $154,731.46.

16.     Between 2010 and 2012, Parkway advanced monies for payment of past due and sold real estate taxes on the Property in the amount of $14,710.16.

17.     On January 29, 2013, an event of default was declared as a result of Casali's failure to pay when due real estate taxes owing on the Property.

B.    **Stipulated Documents** (By numbered paragraph in Amended Stipulation which was admitted into evidence at the beginning of the trial *(See Trial Transcript 11/9/2015 page 9-12)*. There was discussion in the record removing Joint Stipulated Exhibit 8 (Deposition of Casali) but there was no discussion removing Exhibit 9 (Deposition of Laura D'Amato) and as a result all Joint Exhibits except for Exhibit 8 were admitted into evidence.

1.     The Credit Agreement and Disclosure dated May 5, 2003 executed by Casali in favor of Parkway.

2.     The Credit Agreement and Disclosure dated August 21, 2008 executed by Casali in favor of Parkway.

3.     Mortgage dated May 5, 2003 executed by Renato Casali and Anna Casali in favor of Parkway for the property located at 4547 Potawatomie, Chicago, Illinois 60656.

4.     Assignment of Rents dated May 5, 2003 executed by Renato Casali and Anna Casali in favor of Parkway for the property located at 4547 Potawatomie, Chicago, Illinois 60656.

5.     Disbursement Request and Authorization Form dated May 5, 2003 executed by Casali in favor of Parkway.

6.     Payoff Letter received by Casali from Household Finance Corporation dated May

4

7, 2003.

7.     Payoff check dated May 10, 2003 issued by Parkway to Household Finance Corporation in the amount of $154, 731.46.

8.     Deposition transcript of Renato Casali dated May 28, 2015 taken in Case No. 13 CH 08411, titled *Parkway Bank and Trust Company v. Renato Casali, et al.,* pending in the Circuit Court of Cook County, Chancery Division.

9.     Deposition transcript of Laura D'Amato dated June 1, 2015 taken in Case No. 13 CH 08411, titled *Parkway Bank and Trust Company v. Renato Casali, et al.,* pending in the Circuit Court of Cook County, Chancery Division.

C.     **Casali Exhibits Admitted into evidence *(See Trial Transcript 11/9/2015 page 30-31).***

Casali Exhibit 1-Appraisal Report, dated April 21, 2003 of 4547 Potowatomie, Chicago, Illinois;

Casali Exhibit 2-Commitment and Disclosure Facsimile transmittal form dated April 23, 2003;

Casali Exhibit 3-Release Deed Signed April 30, 2003;

Casali Exhibit 4-Pending Customer Information Sheet;

Casali Exhibit 5-Curriculum Vitae of Mary Jahnke; and

Casali Exhibit 6-Expert Witness Report, by Mary Jahnke.

D.     **Testimony of Laura D'Amato and Renato Casali**

1.     Parkway knew that the Household loan was a Line of Credit *(See Trial Transcript 11/9/2015 page 35, lines 21-24).*   Household also knew that at any given moment that there might be more money borrowed against the Household Line of Credit.  *(See Trial Transcript 11/9/2015 page 36 line 25 to page 37 line 4).*

2.     The Parkway Loan occurred May 5, 2003 *(See Trial Transcript 11/9/2015 page 36, line 18 to page 38 Line 11)*.  The Parkway Loan closing occurred on May 5, 2003. *(See Trial Transcript 11/9/2015 page 41, lines 10-12)*.  As of May 5, 2003, Parkway did not know the payoff balance *(See Trial Transcript 11/9/2015 page 41, lines 13-16 and page 64, line 21)*.

3.     The HFC payoff letter is dated May 7, 2003 *Plaintiff's Exhibit 4 and Joint Stipulated Exhibit 6)*; The HFC Payoff letter dated May 7, 2015 was sent by facsimile by Defendant to Parkway on May 9, 2003 *Plaintiff's Exhibit 4 and See Trial Transcript 11/9/2015 page 100, lines 17-19*.  The check to Household was issued by Parkway on May 10, 2003. *Plaintiff's Exhibit 5 and See Trial Transcript 11/9/2015 page 100, lines 23-25*.

4.     The Ordinary standard and reasonable lending practice and Parkway's policy is to verify amount of payoff before remitting the funds. *See Trial Transcript 11/9/2015 page 58, line 24 to page 59, line 3 and page 100, lines 7-10*.  Parkway did not  verify the amount of the Household payoff before remitting its check. *See Trial Transcript 11/9/2015 page 58, line 24 to page 59, line 3 and page 101 lines 11-16*.

5.     Donna Adajar (Parkway employee) had the responsibility to  verify that Household's lien was released with Donna Adajar failed to do.  *See Trial Transcript 11/9/2015, page 90 and 104*. Donna Adajar also failed to keep a log to see if a loan policy  was issued to Parkway.  *See Trial Transcript 11/9/2015, page 104*. Verifying release of a lien was the responsibility of Donna Adajar and that was not done. *See Trial Transcript 11/9/2015, page 90 and 104.*

6.     Parkway did not produce a witness (and was asked by the Court specifically to do so) to testify whether Household was called by Parkway prior to Parkway disbursing any funds to Household. (*See Trial Transcript 11/9/2015 page 73, line 10 to 16).*

6

7.      After a Parkway loan is approved, Parkway used a checklist to prepare for and close the loan.  *See Trial Transcript 11/9/2015 page 78, line 11 to 22.*  Since the amount of Parkway loan to Casali  was over $200,000,  it was Parkway's standard operating procedure both today and back at Parkway in 2003 to have a loan policy issued. *See Trial Transcript 11/9/2015 page 106, lines 6-12.*

8.      The apprised value of the real estate was $375,000 on April 21, 2003 and the Parkway's loan was for $260,000.00 *See Trial Transcript 11/9/2015 page 109, line 17 to page 11..*

*9.*      Parkway knew in 2008 at the time of the Refinance that Household was in a first lien position and Household had not released it lien.  *See Trial Transcript 11/9/2015 page 96 line 15 to 19.*

*10.*      Had Parkway followed up as to why a release was not issued, it would have discovered that Household had not released its mortgage. *See Trial Transcript 11/9/2015 page 103 line 25 to page 104 line 3.*

11.      Parkway handled the closing of the Parkway loan and recording themselves and did not use a title agent.  *See Trial Transcript 11/9/2015, page 107, line 12 to page 109 line 12.*

12.      Parkway did not use sound lending policy regarding failing to get an updated payoff from Household prior to disbursing the loan proceeds to Household on May 10, 2015. *See Trial Transcript 11/9/2015 page 100, line 6-9.*

13.       "**The above quote is subject to a final audit**.  The payoff quote does not waive our rights to receive any funds, which are due and owing on this account as a result of **any subsequent adjustments**, which may include but are not limited to **recent advances**, returned items and additional fees.  **Additionally, we will not release any**

**security interest until the account is paid in full**." (emphasis added) *Plaintiff's Exhibit*

*4.*

14.     Casali made all monthly payments due under the loan to Parkway from the

inception of the loan until Parkway held them in default in 2013.  Casali was held in default for

failing to pay real estate taxes on the Property.  Parkway claims that it first discovered that

Household's mortgage was not released in 2013, when it received minutes of foreclosure when

in reality Parkway discovered its error in 2008. *See Trial Transcript 11/9/2015 page 148 line 22*

*to 25.*

*15.*     Casali believed that since he had a long relationship with HSBC and his account

was not closed and the HSBC account paid off that amounts thereafter would be in a new

account that was secured mortgage which was now in second position based on the payoff by

Parkway.  *See Trial Transcript 11/12/2015 page 121 line 21-25.*

*16.*     Casali did not know that a check was processed by HSBC during the three day

rescission period,  as that check for $2,858.00 had been delivered to the payee a couple of

months earlier.  Casali believed that the amount in that check was included in the payoff amount

by HSBC.  *See Trial Transcript 11/9/2015 page 133 line 16 to 25.*

17.     Casali, believed Parkway Bank had the first mortgage on his house and that HFC

had second position. Casali thought that HFC sent the HELOC checks because he was always a

good customer.  Casali received a statement in the mail that said it was still open. Casali had the

equity in the house. The house definitely had the value at the time, so it wasn't that surprising to

Casali that Household maintained their mortgage as second mortgage and didn't want to lose

Casali as a  customer because, again, the equity was there at the time. *See Trial Transcript*

*11/12/2015 page 147 line 6 to 25.*

18.    Casali spoke with a representative from HFC to inquire if his HELOC was still open and the agent verified that it was. *See Trial Transcript 11/12/2015 page 142 line 11 to 24.*

E.  **Testimony of Mary Jahnke (See Defendant's Exhibits 5 & 6 which are admitted into evidence**

1.    Expert Witness, Mary Jahnke ("Jahnke") described the loan and loan closing process as: 1) obtain documentation from the loan officer and the processor; 2) review the documentation in the file to ensure that it's correct, complete and accurate; 3) review the borrowers' names, addresses, information; 4) review their title commitment to make sure there are or are not any outstanding liens, judgments, mortgages, foreclosure actions, things of that nature; 5) prepare the mortgage documents; 6) provide information to the title company; 7) the title company would prepare the HUD-1 statement, which is the settlement statement of the loan which would indicate payoffs, new mortgages being taken out, any and all fees to the lender and the title company; 8) review the HUD 1 settlement statement for accuracy; 9) the borrower would go to the settlement office, which is the title company, or come to our office where at this point you would have a settlement officer from the title company close the transaction; 10) review the signed documentation which would include the note, the mortgage, the HUD 1 settlement statement; 11) authorize funding to the title company; and 12) the title company would disburse the funds to the payoff lender, the lender being paid off, to the borrower, to themselves as necessary. *See Trial Transcript 11/12/2015 page 49, lines 3-25 to page 50 lines 1-8.*

2.    Expert Witness Jahnke explained that a Home Equity Line of Credit ("HELOC") is different than a closing with a conventional loan because with a HELOC transaction, the lender or loan closer would definitely want to contact the current lender, the HELOC lender, get a current payoff amount, and also have either the borrower write a statement or have the lender

statement stating that the borrower wishes to pay off, close and release the HELOC loan. *See Trial Transcript 11/12/2015 page 50, lines 16-22.*

3.      Jahnke gave an opinion that Parkway Bank, the lender, did not perform due diligence or operate in a sound manner when they did not follow up for the release deed paying off the HELOC line of credit after Parkway stated it was paid.  *See Trial Transcript 11/12/2015 page 54, lines 24-25 to page 55 lines 1-3.*

4.      Jahnke supported the due diligence opinion by testifying that it is not sufficient for a lender to rely on a borrower's signature when a line of credit is being closed as one should always follow up for a release deed as lenders make mistakes every day. *See Trial Transcript 11/12/2015 page 55, lines 9-15.*  "I would say that both Parkway and TCF (*corrected later in the transcript to mean Household instead of TCF*).  Parkway would make the mistake in that they did not follow up on that release to make sure that the line was paid off in full and closed and released. *See Trial Transcript 11/12/2015 page 55, lines 18-25.*

5.      When closing on a HELOC, Jahnke would typically utilize a title company to close her transactions, so the title company would be tasked with doing the legwork after the fact. In other places Expert Jahnke worked, the closers have closed those transactions themselves, and they're tasked with following up frequently with that paid off lender to make sure that the lender is paid off, closed and a release deed is issued. *See Trial Transcript 11/12/2015 page 56, lines 13-22 to page 57 lines 1-5*

6.      After closing, Expert Jahnke testified that in order to know the prior loan was paid off, she would receive the title policy indicating it was paid off and cleared. Or in cases without a title policy they would have a tickler file that we follow up on a weekly basis with our title

company to insure that policies have been issued. *See Trial Transcript 11/12/2015 page 56, lines 8-14.*

7.    In Expert Jahnke's second opinion she stated "That Parkway did not operate in a safe, sound manner when they did not have a title policy issued or follow up on the title policy and the release deed." *See Trial Transcript 11/12/2015 page 57, lines 23-25.* 1st Advantage issues title policies 100 percent of the time. *See Trial Transcript 11/12/2015 page 58, line 5.* If you are not going to obtain a title policy, you should definitely do the follow up yourself to insure that you have a valid first lien position. *See Trial Transcript 11/12/2015 page 58, lines 22-25.*

8.    In response to the Court's questions, Jahnke explained that the new loan disbursed on the date of the disbursement which was three days after the signing of the loan documents. *See Trial Transcript 11/12/2015 page 59, lines 7-9.* Under circumstances as in this case, Jahnke would have recommended that they call the payoff lender and verify the payoff amount, overnight the payoff funds to them, follow up within 3 to 5 business days to insure that the funds have been received and are adequate to pay off and close the line, and then follow up for the release deed. *See Trial Transcript 11/12/2015 page 59, lines 23-25.*

9.    The Court questioned Expert Jahnke as to her opinion that she could not rely on the promise of a borrower to cancel, take on the burden of canceling the old loan. Jahnke's answer was a clear "No, your Honor." When the Court further asked, "The promises of borrowers, new borrowers to pay off the old loan, how serious is that in the world of home finance and refinance?" Jahnke responded with, "I trust no borrower. I'm responsible for doing that follow up and due diligence myself." *See Trial Transcript 11/12/2015 page 49, lines 3-25 to*

*page 50 lines 1-8.* "I do not believe that a lender should ever rely on the promise of a borrower." *See Trial Transcript 11/12/2015 page 61, lines 13-15.*

10.     Expert Jahnke continued to explain to the Court that as a mortgage lender, it her my job and my position to safeguard the company's assets, and only can I guarantee that that has been done by doing so myself. Whether we are looking at 2008 or 2003, this standard has remained the same in every place she was employed. *See Trial Transcript 11/12/2015 page 61, lines 2-9.*

11.     Parkway did not operate in a safe manner because they failed to obtain a title policy or have the title company settlement agent close either transaction. *See Trial Transcript 11/12/2015 page 62, lines 17-29 .* Expert Jahnke uses settlement agents in 100 percent of her closings. *See Trial Transcript 11/12/2015 page 62, lines 23-25.*

12.     According to Expert Jahnke, "Settlement agent insure that the documents are signed, dated and notarized correctly and explained to the borrower, and they also insure that all liens are paid off on the property and that you have a first lien position or a valid second lien position if you are doing a new second mortgage. *See Trial Transcript 11/12/2015 page 63, lines 4-19.* If the lien was not properly paid off, the title company takes responsibility. *See Trial Transcript 11/12/2015 page 63, lines 14-17.*

13.     In 2008, Parkway did not operate in a safe or sound manner when they failed to obtain a title search or a title commitment on that refinance transaction. (Trial Transcript V. III, p 63 lines 24-25, p. 64 lines 1-2) The report would show you any outstanding liens, judgments attached to the property, anything of that nature. It would have clearly disclosed that the prior HELOC lender had not released their lien, and it was still an active lien on the property. (Trial Transcript V. III, p 64 lines 4-9) Parkway should have obtained a title search or title commitment

to check out any other liens on the property. They should have investigated at that point as far as

the old HELOC lien not being released and why it wasn't released. (Trial Transcript V. III, p 64

lines 18-22).

14.     In 2008, Parkway failed to properly review and evaluate the credit report of the

debtor to insure that the Household Finance lien was closed because had they properly reviewed

that credit report, it would have indicated that the Household Finance lien was still open and

active. *See Trial Transcript 11/12/2015 page 65, lines 3-8.*

15.     In the event that a lender received a credit report and it showed an open line of

credit, what would have happened at that point in the loan process a lender should have asked the

borrower what it is, where it came from, why it's still there, especially if you had previously

given him a lien in which you thought it was paid off. *See Trial Transcript 11/12/2015 page 67,*

*lines 6-9.*

16.     Parkway did not operate in a safe or sound manner when Parkway failed to have

that transaction closed by a sub title company settlement agent nor a title policy issued at that

point. *See Trial Transcript 11/12/2015 page 67, lines 12-16.*

17.     Even with no particular warning a lender should always be suspicious whenever it

makes a credit decision. A lender should review the credit report, the title commitment. If its not

going to do that, it should review the land record they responsible for doing that investigation.

*See Trial Transcript 11/12/2015 page 68, lines 2-21.*

18.     By failing to contact the borrower and ask to be made whole  or making the loan

in default Parkway has lost some of their remedies. *See Trial Transcript 11/12/2015 page 69,*

*lines 8-11 to page 70  lines 4.*

## II.    ARGUMENT

A. Standard and Burden of Proof

Parkway as the party seeking to establish an exception to the discharge bears the burden of proof.  *Selfreliance Fed. Credit Union vs. Harasymiw* (In Re Harysymiw, 895 F.2d 1170, 1172 (7th Cir. 1990).  The United States Supreme Court has held that the burden of proof required to establish an exception to discharge is a preponderance of the evidence.  *Grogan vs. Garner*, 498 U.S. 279, 291 (1992).  To provide an "honest but unfortunate debtor "with a fresh start, courts will construe exceptions to discharge strictly against a creditor and liberally in favor of the debtor.  *Id*. at 286-87.

The Amended Complaint seeks determination of non-dischargeability of debt only under section 523(a)(2)(A) of the Bankruptcy Code, which provides that a debtor shall not be discharged from any debt for money **"to the extent obtained by** false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's...financial condition.  *11 § 523(a)(2)(A) Emphasis added*.  As discussed in the Motion for a Directed Finding, the language of the relevant statue is the key. As discussed below, the language "obtained by" in 11 § 523(a)(2)(A) clearly indicates that the alleged conduct must occur at the inception of the debt that caused Parkway to part with their money (the date the loan was made on May 5, 2003.

*11 § 523(a)(2)(A)* describes three separate grounds for holding a debt to be nondischargeable: false pretenses, false representation, and actual fraud.  *In re Jairath*, 259 B.R. 308, 314 (Bankr. N.D. Ill. 2001). Each ground for excepting a debt from discharge under § 523(a)(2)(A) must be separately considered. *In re Jacobs*, 448 B.R. 453, 470 (Bankr. N.D. Ill. 2011).

To except debts from discharge for false pretenses or false representation (Parkway doe not allege fraud), a creditor must show: (1) the debtor made a false representation of fact, a representation, (2) which the debtor, either (a) knew was false or made with reckless disregard for the truth or (b) that debtor possessed an intent to deceive or defraud (3) upon which the creditor justifiably relied. *In re Davis*, 638 F.3d 549, 553 (7th Cir. 2011); *Ojeda v. Goldberg*, 599 F.3d 712, 716 (7th Cir. 2010). All three elements must be proven to prevail on § 523(a)(2)(A) claim. *In re Ardisson*, 272 B.R. 346, 357 (Bankr. N.D. Ill. 2001).

False pretenses under 11 U.S.C. § 523(a)(2)(A) "include implied misrepresentations of conduct intended to create or foster a false impression." *In re Morgan*, BR 09 B 42248, 2011 WL 3651327, at *4 (Bankr. N.D. Ill. Aug. 18, 2011) (internal citation omitted); *In re Sarama*, 192 B.R. 922, 927 (Bankr. N.D. Ill. 1996). A false pretense does not require overt misrepresentations. *In re Sarama*, 192 B.R. at 928. Rather, "omissions or a failure to disclose on the part of the debtor can constitute misrepresentations where the circumstances are such that the omissions or failure to disclose create a false impression which is known by the debtor." *Id*.

*In re Howard,* 339 B.R. 913, 919 (Bankr.N.D.Ill.2006) warns that the court in each case must undertake a factual, subjective inquiry decided by examining all of the relevant circumstances. This is relevant as Parkway has cited many cases (including *Morgan* and *Samara* in the prior paragraph) which state case law which support Parkway at first glance but upon an examination of the case cited it becomes evident that that facts in the cited case are not close to the facts of the case at bar.  In *Morgan*, at the time the agreement was entered into Morgan led Westmont (the creditor in that case) to believe that the stock was part of their current paid for stock/or supplies when it actuality it was not and all of the representation were at the time of the Agreement.  In essence, the misrepresentation in *Morgan* was an active one where in the case at

bar the alleged misrepresentation can only be described as passive if any part of boilerplate

language.   In *Sarama*, the Debtor promised a payment and later renegotiated the contract with

the undesired promise to Memorial Hospital as part of the original agreement and is proven that

he never intended to make that payment.   Samara dealt with fraud as a part of that promise and

not a loan agreement as in the case at bar.

In *Perlman v. Zell,* 185 F.3d 850, 852 (7th Cir. 1999), which is cited by Parkway the

issue before was fraud and RICO in a Contract dispute and did not involve a bankruptcy case,

non dischargeability or false representations.   The statement quoted by Parkway was take out of

context by Parkway as the 7th Circuit was noting that breach of contract is not fraud.   Again

*Pearlman* has nothing to do with the timing of misrepresentations.

What is important is that False pretenses and false representation under § 523(a)(2)(A)

requires that "the debtor made false representation of fact . . . ." *Ojeda*, 599 F.3d at 716. A false

representation under § 523(a)(2)(A) must relate to a present or past fact, and a debtor's false

contractual promise will not typically support a § 523(a)(2)(A) claim. *In re Hernandez*, 452 B.R.

709, 723 (Bankr. N.D. Ill. 2011). A promise constitutes a false representation under

§523(a)(2)(A) only if the debtor made the promise without an intention of ever keeping it.

*Chriswell v. Alomari (In re Alomari)*, 486 B.R. 904, 911-12 (Bankr. N.D. Ill. 2013); *In re*

*Hernandez*, 452 B.R. at 723.).   The only facts that can be considered by this Court occurred on

and prior to May 5, 2003 (the date the loan agreement was signed and the closing occurred.

False pretenses, false representation, or actual fraud under § 523(a)(2)(A) requires proof

that the debtor acted with intent to deceive. *Pearson v. Howard*, 339 B.R. 913, 919 (Bankr. N.D.

Ill. 2006). Intent to deceive requires the debtor's subjective intent to deceive when the debtor

made the representations. *In re Monroe*, 304 B.R. at 356.   Parkway has stated in their brief as to

the Intent prong of § 523(a)(2)(A) a court may consider additional evidence beyond at the time of the alleged misrepresentation "because proof of fraudulent intent may be unavailable, the scienter requirement may be inferred from surrounding circumstances. *In re Kucera,* 373 B.R. 878, 884 (Bankr.C.D.Ill.2007). Courts can consider subsequent conduct as long as that conduct provides an indication of the debtor's state of mind at the time of the actionable representations. *Hanson,* 432 B.R. at 327, citing *Williamson v. Busconi,* 87 F.3d 602, 603 (1st Cir. 1996)(explaining that "subsequent conduct may reflect back to the promissor's state of mind and thus may be considered in ascertaining whether there was fraudulent intent at the time the promise was made").

However, this is a very slippery slope.  The case cited clearly only allow this type of evidence of proof "as long as that conduct provides an indication of the debtor's state of mind at the time of the actionable representations."  Parkway spent much time in adducing evidence of the Debtor's post loan actions.  Much of the facts cited by Parkway in their Post Trial Brief on page 5 deals with events which happened post loan and some years later.  The allowance of this type of evidence must somehow show the Debtor's state of mind and not necessarily show the Debtor took action which might be a simple contractual violation of actionable under another Chapter of the Bankruptcy Code.

Justifiable reliance by the creditor must be shown for false representations and false pretenses under § 523(a)(2)(A). This requires the creditor to not "blindly rely upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Field v. Mans*, 516 U.S. 59, 71 (1995). The creditor's duty to investigate arises when the falsity of the representation would have been readily apparent. *Ojeda*, 599 F.3d at 717 (citing *Field,* 516 U.S. at 70–71).  Parkway notes in

17

their Statement, "In holding that justifiable reliance is the standard to be employed under §523(a)(2)(A), the Court cited to the Restatement of Torts (Second), which states that "a person is required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he utilized his opportunity to make a cursory examination or investigation." *Id.* Citing to the 1978 edition of Prosser's Law of Torts, the Court stated that justifiable reliance is the standard applicable to a victim's conduct in cases of alleged misrepresentation and that "it is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own." *Id.*  The Court should note here an below the Parkway in the superior party in this transaction.  Parkway decided the amount of the loan, what the loan documents said and all other details about the representations made.  Simply, Parkway had knowledge and intelligence regarding loan transactions which Casali did not.  With these basics it obvious that Parkway cannot and did not prove any part of their case.

## B. False Representation of Fact

The first element under §523(a)(2)(A) requires that a creditor prove that the debtor made a false representation of fact. *Aguilar,* 511 B.R. at 512. Parkway alleges in its Post Trial Statement two alleged misrepresentations.  Throughout the trial, counsel for Parkway continually told this Court that Casali had made representations.

During the testimony of Casali, the Court asked Casali, "Now, you promised in a writing that you would obtain the release of the old loan, did you not?" After an Objection that the question mischaracterized the evidence, the Court made counsel for Parkway show Casali the document that so stated that Casali made a promise to release to old loan.  Subsequently,

Parkway's counsel showed Casali a provision in Exhibit 3 which stated, 1) "The specific purpose of this loan is to pay off the first mortgage with Household Finance Company for 80,000 and additional funds will be used for investment purposes; and 2) Financial condition. By signing this authorization, I represent and warrant to the lender that the information provided above is true and correct and that there has been no material adverse change in my financial condition as disclosed in the most recent financial statement to the lender."  The Court should note that there never has been any evidence or allegations that Casali gave incorrect or false information on his loan application.  *See Trial Transcript 11/12/2015 page 154 line 10 to 157 line 9.*

The following exchange then took place:

THE COURT: Now, sir, do you now acknowledge that you agreed in writing to pay off
the old loan?
MR. CHUPACK: Your Honor, I apologize, but I object to that question.
THE COURT: Why?
MR. CHUPACK: Because the statement just states what the purpose of the loan was for. It
doesn't state an obligation. Maybe your Honor is implying it, but it's just stating what the purpose
of the loan is for.
THE COURT: And where was that purpose written?
MS. BRYAN: May I, your Honor?
THE COURT: Disbursement instruction?
MS. BRYAN: Yes, your Honor. That's the exhibit.
THE COURT: You claim that there is an express promise to pay off the loan somewhere in
writing?
MS. BRYAN: Your Honor, our position would be --
THE COURT: Is there an express promise in writing to pay off the loan?
MS. BRYAN: Your Honor, that is the exhibit, yes. It's in there.
THE COURT: And where does it say that?
MS. BRYAN: Your Honor, I submit that because the specific purpose states that the loan is to
pay off the first mortgage and that he says that he is signing this authorization to represent and
warrant that the information provided above is true and correct, that that is an express promise to
use the proceeds of this loan to pay off the previous loan.
THE COURT: Does it anywhere use the words release? Obtain release?
MS. BRYAN: No, your Honor. There is no document that specifically uses the words or
contains a promise for him to obtain a release.

*See Trial Transcript 11/12/2015 page 157 line 9 to page 58, line 24*

Parkway's actions in this trial demonstrate why trials occur.  In a trial a party is forced to actually prove their case.  The example above demonstrates that Parkway had lots of allegations but no actual misrepresentations.  Based on Parkway's suggestion above that if a loan states a purpose or show the reason for the loan (the payee on a credit card) then every loan would be non dischargeable. Thankfully, Parkway does not make the law and in this Courtroom, Parkway must actually prove the elements of non dischargeability.  As stated, based on §523(a)(2)(A) the first element requires a false representation.

An obvious question is: what more than instructing Household to close the Line of Credit is required by Casali?  Telling Household to close the account is more than sufficient for a consumer such as Casali as demonstrated by his testimony.

Even though at trial it was obvious there was no false representation, Parkway in its Post Trial Statement is again saying there were two false representations (even though it admitted there was nothing in writing at trial as stated above).  Parkway now alleges Casali made two misrepresentations or false representations of fact: (1) Casali would close his line of credit with Household and (2) Parkway's mortgage would be in first position.

### 1) False Representation #1: Casali would close the Parkway Line of Credit

Parkway in their Post Trial Statement explains that "Casali's representation that he would close his line of credit with Household was an inherent part of his loan application with Parkway. With this argument Parkway is attempting to bootstrap a document that was mentioned in passing (the Loan Application) into a false representation.  The Court should note that the Loan Application (both 2003 and 2008) was not even marked as an Exhibit or admitted into evidence.  As a result, nobody knows what was in writing in the loan application.  If Parkway wanted this Court to consider written representations in the Loan Application, Parkway should have included such

documents in its List of Exhibits.  Now that the fact there were no false representations were laid

bare, Parkway is trying to bootstrap and get creative.  This Court cannot allow this after trial.

Parkway also now wants to bootstrap other documents to this creativity such a payoff

letter that was not prepared by Casali and the check sent by Parkway to Household.  In fact, the,

the only instruction by Casali in the payoff letter is the instruction to close the account which a

statement to Household and not Parkway.  In that document, no representation is made to

Parkway.  The instruction is to Household to close the account.  Nowhere in writing does Casali

promise to Parkway that he would close the account.  Based on Casali's testimony it is obvious

that Casali is a simple person who does what he is told and instructed.  His testimony is clear on

the feature as quoted above.  Again the check to Household is not signed by Casali or a

representation.

Parkway as part of this argument attempts to also use the additional events after the loan

was made on May 5, 2003.  As stated earlier, additional events such as additional Household

disbursements can only be taken into effect for Prong two relating to Intent.  To do otherwise

would be contrary to the Statute.  Parkway cannot use these additional disbursements to show

that a misrepresentation itself was made.  The only time the misrepresentation can be measured

is at the time the loan was made on May 5, 2015.

As such, there is no representation by Casali to close his line of credit with Household at

the time he entered into his loan with Parkway.  Again this is all measured at the time of the loan

on May 5, 2015 and not subsequent.

### 2) False Representation #2: Parkway's Mortgage would be in First Position

Parkway now attempts to also bootstrap that Casali represented that Parkway's Mortgage

would be in a first position.  At trial, as cited above, Parkway could not point to any such

document that stated that Parkway would be in First Position on May 5, 2015.  Now Parkway is

pointing to the Tax and Liens Section on Page 4 of the Mortgage.  This is a mortgage and not a

note or other type of document.  This contains boilerplate language that is rarely discussed.  That

is why the misrepresentations that are discussed in a case are on the first page. A careful reading

of the quoted language does give any promise that Parkway would be in first position.  First,

based on the testimony of Casali, Casali clearly testified that hr thought and believed that

Parkway was in first position and Household in second position.   Second, Parkway at least until

2008 has the same belief that Parkway was in first position.  Casali nor Parkway had any

knowledge that Household had not received its loan.  For a representation to be false, there must

be knowledge that it is false.  Parkway has never produced any evidence that this is the case.

Additionally, the Cook County Circuit Court (the Court should note that Parkway has this in

their Post Trial Statement as well based on Judicial Notice) has now found that Parkway has first

priority up to the amount of the $154,731.46 disbursement so Parkway was in first position for

that disbursement at the time that the loan is made (Casali asks for the Court to take Judicial

Notice over this fact).  Finally, again the alleged misrepresentation is measured on May 5, 2015

and not using the subsequent events procured by Parkway was not false when Casali signed the

mortgage.

### 3) Casali Had an Obligation to Disclose that the Payoff Letter Amount was Inaccurate.

Casali has argued above, that the statements were true at the time they were made.  In

order to get past a position that cannot be proved Parkway is getting creative again and arguing

that Casali had an obligation to Disclose that the Payoff Letter was inaccurate. This new

argument seems to lead to a Fraud allegation which appeared nowhere in the record or testimony

at trial.  In fact, Fraud was not even alleged in the Amended Complaint.  Additionally, there is

nothing in Parkway's Proposed Findings of Fact and Conclusions of Law that even come close to

mentioning Fraud. Parkway does not state the elements of Fraud under §523(a)(2)(A) except for

a single paragraph in its Post Trial Statement.  The issue of Fraud under §523(a)(2)(A) can not be

considered at this late time and should be deemed to waived.

Additionally, the testimony of Casali indicated that Casali had no idea that the

disbursement of $2,858.00 had been made.  The argument by Parkway is not based on any

evidence before the Court.  Even if such a duty existed (which Parkway does not state where this

duty come from) Casali had no idea that the amount of the payoff had changed.

Parkway could have asked questions of Casali but did not even attempt to call Casali in

its case in chief.  This argument should have been developed sometime prior to the Post Trial

Brief.  Parkway never even asked a few questions of Casali at Trial that related to fraud.  Instead

Parkway only asked questions of Casali when forced to because of the Court's questions.

**C. Knowledge that the Representations were Not False or Made with Reckless
Disregard for the Truth or Made with the Intent to Deceive.**

The second prong of the analysis under §523(a)(2)(A) of the Bankruptcy Code requires

that Parkway prove that Casali knew the representations were false and or made with reckless

disregard for the truth and made the representations with intent to deceive. *Aguilar*, at 512-513.

Parkway alleges that Casali's pattern of behavior during and after the closing and disbursement

of Parkway's loan proceeds establishes that Casali knew the representations he made to Parkway

were false or made with the reckless disregard for the truth and intent to deceive.

Based on the arguments, testimony and document presented there was no showing of

intent on behalf of Casali.  The only argument made by Parkway regarding the issue of intent is

that Parkway believes intent is shown by the subsequent disbursements on the Household Line of

Credit.  In his testimony, Casali, stated he believed Parkway Bank had the first mortgage on his house and that HFC had second position. Casali thought that HFC sent HELOC checks to him post May 5, 2003 because Casali was always a good customer.  Casali received a statement in the mail that said it was still open. Casali had the equity in the house. The house it definitely had the value at the time, so it wasn't that surprising to Casali.  *See Trial Transcript 11/12/2015 page 147 line 6 to 25.*  Casali believed that since he had a long relationship with HSBC and his account was not closed and the HSBC account paid off that amounts thereafter would be in a new account that was secured mortgage which was now in second position based on the payoff by Parkway.  *See Trial Transcript 11/12/2015 page 121 line 21-25.*  Casali did not know that a check was processed by HSBC during the three day rescission period,  as that check for $2,858.00 had been delivered to the payee a couple of months earlier.  Casali believed that the amount in that check was included in the payoff amount by HSBC.  *See Trial Transcript 11/9/2015 page 133 line 16 to 25.*

Parkway's suggestion that because their were continued disbursements and that the fact that Casali could have closed the account have an indication of intent are false.  Casali thought all this time that that Household had a Second Mortgage.  This is confirmed by Casali's testimony above which confirms Casali's belief that House hold  was keeping the Line of Credit open as a Second Mortgage.

Parkway has the burden to prove that the subsequent disbursements to the Household Line of Credit demonstrate Parkway's viewpoint is more likely true than Casali's testimony. Parkway has not met their burden of proof as there is no evidence to support its viewpoint. As a result, Parkway has not met is burden of proof to satisfy the second prong of the analysis under §523(a)(2)(A).

24

**D. Justifiable Reliance**

The final prong examines whether the creditor reliance upon the misrepresentation was justifiable. Justifiable reliance is a less demanding standard than reasonable reliance. The actions of Parkway and the banking practices it employed in this loan do not come anywhere close to what is required for either type of reliance.

Parkway presented the testimony of Ms. Woods to show how its reliance was justifiable. However, Ms. Woods' testimony does not help Parkway as it is not credible. This Court heard argument and weighed for a considerable time whether Ms. Woods would even be allowed to testify. The reason for this objection to expert status, as based on the questionable background of Ms. Woods. Ms. Woods, although an attorney, has no knowledge about closing and the closing process except as a Title Officer for a Title Company. If Ms. Woods was being asked to testify regarding a Title issues or whether a Title Insurance claim should have been paid then Ms. Woods would have been an appropriate witness. However, that is not how Parkway used her testimony. More troubling is the actual testimony of Ms. Woods. Ms. Woods' testimony suggests that no releases are every filed and therefore Parkway used appropriate banking procedures in not obtaining a release from Household. Ms. Wood's testimony suggests the Recorder of Deeds records are completely inaccurate and lawless with mortgage companies, individuals and title companies never complying and filing releases. It is obviously clear, that a release is required to be filed with the Recorder of Deeds when an Note and/or Mortgage is satisfied. If Ms. Woods is to be believed, no bank or mortgage company ever has to follow up for a release. Ms. Wood's testimony gives a vision of lawless world in total chaos in regards to releases.

A review of Jahnke's testimony earlier in this document demonstrates in reality how a real estate closing by a bank or mortgage company should be conducted.  Jahnke's testimony is credible and based on the fact of what should happen with a Real Estate closing.  To even suggest that the actions of Parkway in this case is sound banking policy is not reality or the approved practices within the trade.

In the Response to the Motion to Dismiss the Amended Complaint, Parkway concedes that it did not follow sound lending procedure stating:

> This Court has pointed out, in the ruling on the previous Motion to Dismiss, that Parkway could have closed the new loan in escrow and secured a release of the mortgage prior to disbursing the funds to Household.  Parkway concedes that this advisable lending practice would have been infinitely preferable to seeking relief in this adversary.

Parkway hires an expert who has no experience in closings and testified that Parkway acted correctly.  Parkway is now attempting to justify the "sound" lending procedure and that it somehow justifiably relied. No explanation or authority for this position is stated by Parkway except a constant changing of their position as is shown with this example and others in this Post Trial Statement.

There is no question that at this point that Parkway did not even read the Payoff Statement which Parkway likes to refer to.   That Payoff Statement states below the amount of the payoff,

> "The above payoff quote is subject to a final audit.  The payoff quote does not waive our rights to any funds, which are due and owing on this account as a result of any subsequent adjustments, which may include but are not limited to recent advances, returned items and additional fees.  Additionally, we will not release any security interest until the account is paid in full."

The undersigned, as an attorney reading the language in the Payoff Statement, would be of the opinion that Parkway, by proceeding with a lending transaction after reading this language would not be sound banking procedure.  Parkway now after reading the Payoff Statement has

chosen other language and other information to override the clear need with a Line of Credit to verify the Payoff amount.  Parkway has plainly ignored and/or did not read the language in the Payoff Statement   If somebody from Parkway had read this language, no loan would have been made by Parkway without verifying the facts or Parkway did not follow sound banking procedure.   Plainly, the most obvious is that Parkway should have called Household to confirm the information in the Payoff Statement.   By Parkway's admission, no action was taken by Parkway in response to the language in the Payoff Statement.

In closing on the refinance loan to Casali in 2003, Parkway failed to verify the amount of HSBC's payoff before issuing the check, failed to obtain the release of mortgage from HSBC, failed to close with a settlement agent, and failed to obtain a title loan policy.

These failures in closing on the loan are expressly admitted by Laura D'Amato.  Had the Bank followed standard lending practices or even its internal operating procedures  following the closing of the loan, it would have discovered that the HSBC line remained open and its mortgage was not released.  Once discovered, Parkway could have taken steps with HSBC and/or Casali to rectify the situation. There would not have been no need to litigate the lien priority position and no attorneys' fees would have needed to be incurred on that issue.  Further, the problem created by Parkway's failures would have existed whether or not Casali was held in default by Parkway until 10 years later.

## III.    CONCLUSION

The evidence at trial clearly showed that Parkway is in the position it is in today because of its own failures in the loan closing, post closing and monitoring process and not because of the Casali.  Casali is a convenient person to blame by Parkway, but Parkway needs to look to its own employees and procedures for the true party to blame for the real estate at issue. Based on the all

evidence presented in this case, Parkway has not met any of its burden of proof under Section

523(a)(2)(A) of the United States Bankruptcy Code.  Accordingly, Casali asks that the debt owed

by Renato Casali to Parkway Bank be deemed dischargeable pursuant to 11 U.S.C. 523(a)(2)(A)

and Judgment be entered in favor of Casali.

       Respectfully submitted,
       RENATO CASALI

       /s/ Paul M. Bach
       Paul M. Bach, Esq. #6209530
       Of Counsel, Sulaiman Law Group, LTD
       900 Jorie Blvd, Ste 150
       Oak Brook, IL 60523
       Phone (630)575-8181
       Fax: (630)575-8188