United States Bankruptcy Court
Northern District of Illinois
Eastern Division

| | |
|---|---|
| In re: <br><br> Renato Casali, <br><br>                                      Debtor. | Bankruptcy No. 13bk30521 <br><br> Chapter 7 <br><br> Adversary No. 14ap00124 |
| Parkway Bank & Trust Co., <br><br>                                      Plaintiff <br><br>               v. <br><br> Renato Casali, <br><br>                                      Defendant. | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PARKWAY BANK & TRUST'S COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

This adversary proceeding, filed in a voluntary chapter 7 bankruptcy case, is before the Court for decision after trial. Parkway Bank & Trust ("Parkway") filed a complaint seeking determination that the debt owed to it by the defendant, Renato Casali ("Casali"), is nondischargeable under 11 U.S.C. § 523(a)(2)(A). The complaint, as amended, alleges that Casali made knowing misrepresentations when obtaining a loan from Parkway, and caused Parkway to retain a lower priority mortgage on Casali's home than originally agreed to. Casali did not dispute the general terms of the loan as reflected in the loan documents and mortgage, but denied any misrepresentations were made by him in obtaining that loan.

Following trial on the evidence, both parties having rested and filed final arguments in form of Proposed Findings of Fact and Conclusions of Law, the Court now makes and enters its Findings of Fact and Conclusions of Law. As discussed below, the evidence at trial did not establish that misrepresentations were made by Casali in obtaining a loan from Parkway, and Parkway did not justifiably rely on the purported misrepresentations. Accordingly, judgment will be entered in favor of the defendant Casali by separate order.

# FINDINGS OF FACT

Casali filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code on July 31, 2013. Parkway, a creditor in this case, holds a mortgage on Casali's personal residence located at 4547 Potawatomie, Chicago, Illinois 60656 (the "Property"), which is subject to a state court foreclosure action. (Am. Stipulation of Facts & Docs., Dkt. 68 [hereinafter *Stip.*] ¶¶ 3, 4) Parkway's mortgage on the Property secures a personal line of credit loan extended by Parkway to Casali in 2003, renewed in 2008, and appearing to have remained in good standing until January 2013.

### 1. The Parkway Loan – Agreed Terms & Undisputed Facts

In April 2003, Casali approached Parkway to obtain a home equity line of credit from Parkway. At that time, Casali informed Parkway that he had an existing home equity line of credit with Household Finance Corporation ("Household" or "HFC"), which he wanted to refinance with Parkway to obtain a lower rate. (*Stip.* ¶¶ 5–7; Trial Tr., vol. I, 23 (D'Amato), vol. III, 124 (Casali)) Casali's loan application was reviewed and approved later that month. (Trial Tr., vol. I, 24–25 (D'Amato))

Upon approval of Casali's loan application, and in accordance with Parkway's customary procedures, Parkway obtained an appraisal report for the Property—then valued at $375,000.00—and a title commitment from a title insurance company, which disclosed Household's mortgage securing a revolving line of credit for up to $200,000.00. (Trial Tr., vol. I, 24–28 (D'Amato); DX. 1, 2.) Based on the records obtained and and the risk assessment incorporated into Parkway's customary procedures, closing on Casali's loan went forward without the need to employ an escrow agent or obtain title insurance. (Trial Tr., vol. I, 32–33, 68–71 (D'Amato))

Closing on the loan would take place in early May 2003. As detailed below, Parkway agreed to extend a personal line of credit loan to Casali secured by a mortgage on the Property, with an initial disbursement on such loan directed to payoff the Household account to release Household's mortgage.

*a. Loan Closing*

On May 5, 2003, Parkway and Casali executed a Credit Agreement and Disclosure (the "Credit Agreement"), whereby Parkway agreed to extend a line of credit loan with a credit limit of $260,000.00 and maturity date of May 20, 2008 to Casali. To secure this loan, Casali and his wife executed a Mortgage in favor of Parkway, dated May 5, 2003 and recorded on May 6, 2003, pledging the Property as collateral for advances not to exceed the principal amount of $260,000.00. An Assignment of Rents was also executed. (*See Stip.* ¶¶ 8–9; PX 1, 2; Trial Tr., vol. I, 36–40 (D'Amato))

On May 5, 2003, Casali also executed a Disbursement Request and Authorization form, dated May 5, 2003, which identified the "Primary Purpose" of the $260,000.00 line of credit loan as nonbusiness, that is, "Personal, Household, or Family Purposes, or Personal Investments," and the "Specific Purpose" of the loan as: "TO PAYOFF 1ST MORTGAGE WITH HOUSEHOLD FINANCE COMPANY OF $80,000.00 AND ADDITIONAL FUNDS WILL BE USED FOR INVESTMENT PURPOSES." (*Stip.* ¶ 10; PX 3)

Laura D'Amato, a long-time employee of Parkway and familiar with its operations, testified that the Parkway's practice when paying off another equity line of credit was to obtain a Payoff Letter from the lender after closing, with disbursements usually taking place three days after closing upon expiration of the rescission period applicable for such loans. (Trial Tr., vol. I, 41–48)

*b. Household Loan Payoff*

On May 7, 2003, Household provided a Payoff Letter to Casali, later forwarded by him to Parkway, wherein Household identified the total amount due to payoff Casali's account in full as $154,731.46. (*Stip.* ¶ 11; PX 4) The total payoff amount of $154,731.46—the sum of principal balance and accrued interest due plus applicable itemized fees and charges—was listed as only "Good Until" June 6, 2003. (*Stip.* ¶ 12; PX 4) The Payoff Letter also included the following clause:

> The above payoff quote is subject to final audit. The payoff quote does not waive our rights to receive any funds, which are due and owing on this account as a result of any subsequent adjustments, which may include but are not limited to recent advances, returned items and additional fees.

3

> Additionally, we will not release any security interest until the account is paid in full.

(*Stip.* ¶ 13; PX 4) The bottom of the Payoff Letter then provided the following instruction:

> If the credit line is to be cancelled, please sign below and include this letter with your payment. We will forward the necessary documents to the Trustee/County Recorder's office to release our lien within thirty days after the account is paid in full.
>
> Please cancel my credit line. Unless signed authorization to cancel the credit line is received, the line will remain open and we will not release the lien.

(*Stip.* ¶ 14; PX 4)

Casali and his wife both signed the Payoff Letter authorization instructing Household to cancel the line of credit on May 8, 2003. Casali forwarded the signed Payoff Letter to Parkway via facsimile on May 9, 2003. (*Stip.* ¶¶ 11, 15; PX 4)

On May 8, 2003, the day after Payoff Letter was issued by Household, an additional $2,858.00 was debited from Casali's line of credit with Household. (PX 8)

On May 10, 2003, Parkway issued a check to Household for the amount quoted in the Payoff Letter. (*Stip.* ¶ 15) Household received and cashed the check sent by Parkway on May 12, 2003, but maintained an outstanding account balance as a result of the additional advance made on May 8th. (PX 8)

Household received and cashed the check sent by Parkway on May 12, 2003, leaving an outstanding account balance due of $1,899.63. Additional amounts were drawn on May 29th, but no further amounts were withdrawn during the months of June and until July 21, 2003. (*Id.*)

Casali's Household account remained open for ten years, until 2013, when Parkway claims to have discovered it did not have a first mortgage on the Property. By then, the balance due on the Household and the Parkway accounts was greater than the estimated value of the Property, for which foreclosure proceedings remain pending in state court.

### 2. Alleged Misrepresentations

Parkway claims that Casali made the additional $2,858.00 withdrawal after closing on the loan on May 5, 2003. (Am. Compl. ¶ 17) Casali claims the withdrawal resulted from a

4

check provided to a payee prior to closing. (Answer ¶ 17) Parkway relies on Household's account records, but those records only reflect that a withdrawal was done by check on that date. (*See* PX 8)

Casali's testimony during trial was consistent with other evidence in this case, and sufficiently credible in light of the evidence. While Casali testified that he did not recall particular events, his testimony pertains to events that took place well over a decade ago.

Casali testified that his purpose in taking out an equity line of credit loan with Household was investing in real estate. He had gotten his real estate broker's license around that time in 2001 or 2002. Household sent him checks to drawn on the line of credit and he does not recall drawing on his account in any other way. He had not previously taken out a home equity line of credit, or had business accounts at the time. He did have a checking account with Parkway. (Trial Tr., vol. III, 119–23)

Casali testified that particular employees at Parkway suggested he consider refinancing other loans to get a better rate; so he did, to save money. His purpose at the time was refinancing and closing his account with Household to get a better rate. He understood and believed that Parkway's mortgage would be a first mortgage in his property. (*Id.* at 123–25, 128–29)

He testified that he did not recall having made a withdrawal after closing on the loan with Parkway, did not think he did so, and believed the amount in the Payoff Letter was correct when he transmitted it to Parkway. (*Id.* at 133–34)

He further testified that he remembered being somewhat surprised, or believing it was odd, when he received mailings and new checks from Household after he submitted the Payoff Letter to Parkway, and called a representative to confirm whether he still had an open account with Household. When his belief was confirmed, at that time, he assumed that Household had taken a second mortgage; he was a good customer and had sufficient equity in his home at the time. He then continued to pay both loans until Parkway initiated foreclosure proceedings in 2013, not for lack of his loan payments, but because he could not afford his real estate taxes. (*Id.* at 134–35, 147–49)

5

As mentioned before, Casali's testimony is consistent with evidence presented by Parkway in trial exhibits and testimony of its witness and long-time employee, Ms. D'Amato. Parkway and Casali closed on the loan on May 5, 2003. Casali received the Payoff Letter from Household on May 7, and forwarded it to Parkway on May 9 after he and his wife signed it. Payment for the old loan in the amount of the Payoff Letter was made by Parkway one day later, and was received by Household within seven days of closing. The additional check for $2,858.00 was cashed by Household on May 8th.

On May 29, 2003, an additional $30,000.00 was withdrawn from Casali's Household account. (PX 8) No additional amounts were debited during June 2003 or the first half of July 2003. (*Id.*) Further transactions made thereafter were once or twice a month, and Casali would make regular payments on the Household account for the amounts advanced to maintain the account in good standing. Foreclosure proceedings were not initiated until January 2013, ten years after the alleged misrepresentations were made. Parkway identified the following withdrawals made by Casali on the Household loan in the next three years:

| **2003** | | **2004** | | **2005** | |
|---|---|---|---|---|---|
| 07/21/03 | $2,156.93 | 03/26/04 | $35,000.00 | 02/10/05 | $15,000.00 |
| 07/29/03 | $15,000.00 | 07/26/04 | $23,500.00 | 02/17/05 | $7,000.00 |
| 08/11/03 | $20,000.00 | 08/11/04 | $650.00 | 02/24/05 | $10,000.00 |
| 09/09/03 | $17,000.00 | 09/11/04 | $25,000.00 | 03/04/05 | $8,395.00 |
| 10/07/03 | $22,000.00 | 10/27/04 | $3,400.00 | 03/08/05 | $10,000.00 |
| 10/21/03 | $30,000.00 | 11/23/04 | $8,000.00 | 03/21/05 | $6,500.00 |
| 11/28/03 | $7,000.00 | 12/03/04 | $125,000.00 | 03/24/05 | $10,000.00 |
| | | 12/06/04 | $5,000.00 | | |
| | | 12/17/04 | $25,000.00 | | |

Testimony by Parkway's own witness suggests that Parkway may have responsibility for not paying off the Household mortgage. Ms. D'Amato testified that Parkway's general custom and practice when it seeks to payoff a first lender is to contact the first lender to confirm the payoff amount. (Trial Tr., vol. I, 58–59 (D'Amato))

As previously noted, additional amounts were drawn on May 8th, before Parkway received the signed Payoff Letter and submitted payment on the amount stated in that letter on May 10, 2003.

Parkway's general custom and practice in remitting payment is to prepare a cover letter for that lender, enclose a cashier's check, and include the signed statement from the borrower requesting cancellation of the account. (Trial Tr., vol. I, 57 (D'Amato)) The cover letter customarily sent to all lenders includes a request that title, all releases, and cancelled documents be submitted back to Parkway. (*Id.* at 53–54; PX. 6) Although Parkway claims such letter *would* likely have been issued in this case, no documentary evidence establishing that this letter was issued by Parkway was presented during trial.

Parkway's general custom and practice when it pays a first lien holder is to follow up on liens between 30 and 60 days of not receiving a release from the lender. (Trial Tr., vol. I, 63 (D'Amato)) No evidence showed that Parkway followed up on the release of the Household mortgage after the loan was issued, and it appears that Parkway never did so.

Ms. D'Amato's testimony, along with terms in the Payoff Letter stating that the payoff quote was "subject to final audit[ ]" and warning that Household "[would] not release any security interest until the account is paid in full[ ]" (*see Stip.* ¶ 13; PX 4), casts doubt on Parkway's suggestion that the alleged misrepresentation by Casali was the sole reason why Household's mortgage was not released.

Additional transactions identified by Parkway from 2005 to 2008 do not dispute Casali's testimony. Parkway claims that a letter received by Casali on February 9, 2005 gave him notice of the lien and the opportunity to release it. The letter clearly indicated that Household still held a mortgage at the time, but did not show that the letter—issued almost two years after closing on the Parkway loan—related to Parkway's mortgage. (*See* PX 9A)[1] Nor does it suggest that Casali misrepresented his intent to close the account back in May 2003.

---

[1] The letter informed Casali that his account had reached a $0.00 balance and inquired as to whether or not Casali would like to keep Household's line of credit open and active, or close the account. It stated that the account would be closed and the lien securing that account released unless notified. (PX 9A).

7

On August 21, 2008, Parkway and Casali executed a new Credit Agreement and Disclosure for the principal balance of $251,775.00, renewing the terms of the original loan 2003 loan. (PX 1) According to Ms. D'Amato, Parkway's practice at the time of renewal did not require it to search title or otherwise review Casali's credit report. (Trial Tr., vol. I, 80–86) Ms. D'Amato, however, admitted that someone at Parkway did not follow through in getting a release from Household after the Parkway loan was originally extended in 2003. (*Id.* at 86).

Between 2010 and 2012, Parkway advanced monies for payment of past due real estate taxes on the Property in the amount of $14,710.16. (*Stip.* ¶ 16.)

On January 29, 2013, an event of default was declared as a result of Casali's failure to pay when due real estate taxes owing on the Property. (*Id.* ¶ 17.)

## CONCLUSIONS OF LAW

### I. JURISDICTION AND VENUE

Subject matter jurisdiction lies under 28 U.S.C. § 1334. The district court may refer bankruptcy proceedings to a bankruptcy judge under 28 U.S.C. § 157, and this proceeding is thereby referred here by District Court Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. Venue lies under 28 U.S.C. § 1409. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(I). It seeks to determine the dischargeability of a debt. Therefore, it "stems from the bankruptcy itself," and may constitutionally be decided by a bankruptcy judge. *Stern v. Marshall*, 131 S.Ct. 2594, 2618 (2011).

### II. DISCHARGEABILITY OF DEBT

Section 523(a)(2)(A) denies discharge for money obtained by "false pretenses, a false representation, or actual fraud . . . ." 11 U.S.C. § 523(a)(2)(A). Because the goal of bankruptcy is to give the honest debtor a fresh start, *Local Loan Co. v. Hunt*, 292 U.S. 234, 244–45 (1934), debts are presumed dischargeable unless proven to meet the requirements of a statutory exception. *In re Berman*, 629 F.3d 761, 765 (7th Cir.2011); *In re Morris*, 223 F.3d

548, 552 (7th Cir. 2000). The burden of proof consequently rests with the objecting creditor, who must demonstrate nondischargeability by a preponderance of the evidence. *In re Cohen*, 507 F.3d 610, 613 (7th Cir. 2007); *Matter of Scarlata*, 979 F.2d 521, 524 (7th Cir. 1992).

In order to establish an exception from discharge based on a false pretense or false representation, the creditor must prove that: "(1) the debtor made a false representation or omission, (2) that the debtor (a) knew was false or made with reckless disregard for the truth and (b) was made with the intent to deceive, (3) upon which the creditor justifiably relied." *Ojeda v. Goldberg*, 599 F.3d 712, 717 (7th Cir. 2010). Parkway claims that Casali made false representations to Parkway with reckless disregard for the truth and intent to deceive, on which Parkway justifiably relied when extending a loan to Casali. (Pl.'s Post-Trial Statement, at 9)

Parkway claims that Casali made two false representations of fact: (1) that Casali would close his line of credit with Household and (2) that Parkway's new mortgage would be a first lien. (*Id.*) As described above, these representations were part of the parties' agreement at the time of closing, but should have been implemented in the days after closing in accordance with Parkway's general custom and practice governing the type of loan being issued.

A false representation under § 523(a)(2)(A) must relate to a present or past fact, and a debtor's failure to keep a contractual promise will not typically suffice. *In re Hernandez*, 452 B.R. 709, 723 (Bankr. N.D. Ill. 2011). A promise of future performance constitutes a false representation under § 523(a)(2)(A) only if the debtor made the promise without an intention of ever keeping it. *In re Giddens*, 514 B.R. 542, 552 (Bankr. N.D. Ill. 2014) (citing *Perlman v. Zell*, 185 F.3d 850, 852 (7th Cir. 1999); *In re Alomari*, 486 B.R. 904, 911–12 (Bankr. N.D. Ill. 2013).

Although the evidence in this case shows that Casali agreed to close his account with Household in order to refinance that loan, and understood that Parkway would take a first mortgage on Casali's home, the preponderance of evidence does not support an inference

9

that Casali never intended to close his account with Household or give Parkway a first mortgage on the Property at the time Parkway's loan was extended.

Parkway relies on Casali's subsequent conduct to show that Casali never intended to keep his promises at the time he closed on the loan. Courts may consider relevant conduct that took place after the debtor incurred the debt if that conduct indicates the debtor's state of mind at the time the loan was obtained. *See In re Hanson*, 437 B.R. 322, 327–28 (Bankr. N.D. Ill. 2010). In this case, the evidence shows that Casali's account with Household remained open, and that Casali continued to make withdrawals after closing on the Parkway loan and forwarding the Payoff Letter to Parkway. However, Casali testimony explaining these circumstances was credible and consistent with the evidence presented by Parkway.

As noted above, the evidence presented by Casali does not show that Casali made a withdrawal after closing on the loan and before Parkway issued a check for the payoff amount provided in the Payoff Letter. Casali's testified that he intended to close the Household account at that time and believed that the amount in the Payoff Letter was correct. This testimony was credible, even in light of the evidence that Casali would later keep his account with Household open.

Even if the evidence were to show that Casali broke a promise to close his account with Household, the evidence does not support an inference that Casali never intended to keep that promise. Instead, the evidence shows that Casali performed in accordance with that promise when he forwarded the Payoff Letter to Parkway shortly after closing. His conduct was an attempt to perform, which generally suggests a lack of fraudulent intent. *See In re Donlevy*, 342 B.R. 774, 780 (Bankr. N.D. Ill. 2006).

More importantly, the evidence suggests that Casali's Household account would have been closed if Parkway had followed its own internal procedures, as Parkway's own witness identified these procedures. Accordingly, Parkways claim that Casali misrepresented that Parkway would have a first mortgage has no merit, both because the evidence does not show that Casali did not intend this to be the case, and because Parkway disregarded its own procedures for verifying the release of Household's mortgage.

Parkway has also failed to establish that its reliance on the alleged misrepresentation was justifiable. In establishing reliance under § 523(a)(2)(A), the creditor must prove both actual and justifiable reliance on the false statement or omission. *In re Strauss*, 523 B.R. 614, 629 (Bankr. N.D. Ill. 2014). "Actual reliance means that the omission or misrepresentation was the cause-in-fact of the debt." *Id.* Justifiable reliance, in turn, requires that a creditor not "blindly rely" upon a misrepresentation if the creditor could have discovered its falsity by making even "a cursory examination or investigation." *Ojeda*, 599 F.3d at 717 (alteration and citation omitted).

As previously noted, the Payoff Letter specifically stated that the payoff amount was subject to final audit, and that Household's lien would not be released unless the account was paid in full. Parkway's claim that it was justified in relying on the amount quoted in the Payoff Letter is not justified in light of these specific warnings. Nor is this claim supported by the testimony of its own witness, Ms. D'Amato, explaining that Parkway's custom and practice was to verify the payoff amount prior to submitting payment and to follow up to check on the release of the mortgage being paid after issuing payment.

Accordingly, even if Casali had made a withdrawal on his Household account after closing on the loan with Parkway, Parkway's standard procedures contemplated the possibility of subsequent adjustments. Payment for the amount quoted in the Payoff Letter was issued after an additional advance on the Household account was processed, and that amount could have been remedied prior to or after payment was issued by Parkway. Reliance on the payoff amount quoted cannot therefore be said to have been justifiable, or to have caused the injury complained of in this case—a lesser priority mortgage than initially intended.

Furthermore, Parkway later renewed Casali's loan on August 21, 2008 and extended the maturity date for an additional five years. According to Parkway's witness, Parkway's custom and standards would not require it to conduct an appraisal, obtain title commitment from a title insurance company, or even obtain a simple credit report for Casali (which would disclosed that the Household loan remained open). However, Parkway's own witness admitted that while Parkway's custom was to rely on the original loan terms, it was clear that

11

someone had failed to note that a release had not been obtained from Household or that Parkway's own procedures had not been followed.

## CONCLUSION

Parkway did not justifiably rely on the promise of Casali to close the old loan account. Instead, it was unbelievably careless in not protecting its interest in obtaining a first lien. Also, Casali was not shown by preponderance of evidence to have intended to break his promise to perform under the loan agreement and mortgage documents executed between Parkway and Casali.

For the foregoing reasons, Parkway has failed to show that the debt owed to it by the defendant Renato Casali is nondischargeable under 11 U.S.C. § 523(a). Judgment will be entered in favor of the defendant by separate order.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Dated this 7 day of March, 2016

MAR - 7 2016

12